# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-2453

_____

| | | |
|---|---|---|
| Jeanene Zebley, individually and as surviving mother on behalf of Fallon Zebley, | * * * * | |
| Appellant, | * * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of North Dakota. |
| Heartland Industries of Dawson, Inc., | * | |
| | * | |
| Appellee. | * | |

_____

Submitted: May 13, 2010
Filed: November 12, 2010

_____

Before RILEY, Chief Judge, LOKEN and MURPHY, Circuit Judges.

_____

RILEY, Chief Judge.

Fallon Zebley (Fallon), a young woman with mental disabilities, died after she jumped from the fifth-floor fire escape on a building in Fargo, North Dakota. At the time of her death, Fallon was under the care and supervision of Heartland Industries of Dawson, Inc. (Heartland), a licensed non-profit day training, habilitation, and employment services provider. Fallon's mother, Jeanene Zebley (Zebley), brought this wrongful death action against Heartland. A jury returned a verdict in Heartland's

favor. The district court[1] denied Zebley's post-trial motion attacking the jury's verdict. Zebley appeals. We affirm.

## I. BACKGROUND[2]

### A. Fallon and the Team

Fallon was born in 1981. In 1997, Fallon contracted encephalitis. Following four months in a coma, Fallon emerged from the coma with severe brain damage. Fallon's brain injuries resulted in unpredictability, poor judgment, impulsivity, suicidal ideations, seizures, and poor balance and gait. When Fallon became agitated, her unpredictability, poor judgment, and impulsivity worsened. Fallon did not understand the consequences of her actions, avoided responsibility and undesirable activities, sought attention through negative means, and was verbally aggressive and argumentative when "asked to do things she [did] not want to do."

Various organizations helped Zebley and her husband care for Fallon after her brain injury. Heartland provided Fallon with supported employment services, including a "job coach." Divine House provided residential support and maintained Fallon's residence, an apartment in Moorhead, Minnesota. SOLUTIONS Behavioral Healthcare Professionals, Inc. (Solutions) provided behavioral management services. Representatives from each of these organizations, along with Zebley's parents and a representative of Clay County, Minnesota, constituted Fallon's interdisciplinary team (team).

---

[1]The Honorable Ralph R. Erickson, Chief Judge, United States District Court for the District of North Dakota.

[2]We recite the facts in the light most favorable to Heartland, affording Heartland all reasonable inferences from the factual findings implicit in the jury's verdict. See Jones v. Nat'l Am. Univ., 608 F.3d 1039, 1046 (8th Cir. 2010).

## B.    The RMAP and the BPP

The team identified various risks Fallon might encounter in life and approved two plans designed to minimize Fallon's exposure to those risks.  Heartland developed Fallon's Risk Management and Assessment Plan (RMAP), and Solutions created Fallon's Behavior Program Protocol (BPP).

The RMAP, which detailed Fallon's mental and physical impairments, instructed Fallon's care providers to "verbally and physically redirect Fallon as needed to assure her safety."  The RMAP elaborated, "If Fallon engages in behavior that jeopardizes her safety (i.e. walks away from staff . . .) staff may need to physically intervene and if necessary follow . . . policies on emergency control procedures."

The BPP provided Fallon's care providers with detailed guidance on how to respond if Fallon exhibited certain behaviors.  For outbursts in the workplace, the BPP generally advised:

> When Fallon becomes agitated and argumentative she will be given one verbal prompt to find a quiet place to calm down. . . . She will be given no longer than 30 minutes to calm and comply with the staff's request to process the incident,[3] due to vocational time constraints at her job site. If, after 30 minutes, Fallon is not calm and refusing to process, her vocational staff will contact [Aaron Benson, Heartland's Fargo-Moorhead Site Coordinator and Fallon's Qualified Mental Retardation Professional] and [Fallon's] residential Program Coordinator to inform them that Fallon be returned to her apartment.

---

[3]"Process" is a term of art.  To "process," Fallon and her job coach would analyze Fallon's behavior, discovering why the incident occurred and how to avoid such behavior in the future.

In the event of a "physical outburst," including "running away" or "throw[ing] . . . items," the BPP instructed Fallon's job coach to immediately disengage from Fallon so long as Fallon was not in danger. Christine Bietz, M.S., who authored the BPP for Solutions, believed "physical intervention wasn't really appropriate unless there was an extreme health or safety risk." In case of danger, the BPP advised Fallon's job coach to assess whether verbal or physical intervention was appropriate under the circumstances. For example, the job coach might verbally prompt Fallon to "calm" in a quiet and safe place. If the job coach was uncomfortable attempting to intervene without assistance from other staff members, the BPP recommended the job coach contact Solutions or a supervisor.

## C.    Supported Employment

Heartland employed Fallon as an apartment cleaner and trained Malena Rock to supervise Fallon while Fallon worked at various worksites in the Fargo-Moorhead area. Rock started working for Heartland as Fallon's one-on-one job coach in August 2004. Rock's duties included supervising Fallon's work, assisting Fallon if she needed help, keeping Fallon always within eyesight, motivating Fallon, ensuring Fallon's safety, and processing with Fallon after Fallon behaved improperly.

Rock and Fallon enjoyed a good working relationship, and Fallon improved substantially under Rock's tutelage. Fallon stopped "eloping" from worksites and acting out physically, and her behavioral problems and need for processing substantially diminished. Rock was Fallon's best job coach, and served in that role longer than any other person. Rock was calm, thorough, and consistent, and Fallon craved consistency. Rock became very familiar with Fallon and utilized the RMAP and BPP to ensure Fallon's safety.

As of 2005, there was no identified acute risk Fallon would commit suicide. Neither the RMAP nor the BPP specifically required Fallon's care providers to intervene with physical force to prevent Fallon from using stairs, balconies, or fire

escapes. Fallon had not fallen down stairs—intentionally or accidentally—since 2001 or 2002. She lived in a second-floor apartment with access to a balcony and routinely worked in multi-level buildings, including the six-story Ivers Building in downtown Fargo.

Heartland inspected the Ivers Building for safety. Rock believed the Ivers Building's six-floor fire escape presented "challenges" in light of Fallon's unsteady gait and history of falling down stairs. The fire escape "scare[d]" Rock, who feared Fallon "could get out there, [Rock] would not be in a position to deal with [Fallon,] and something bad could happen." Rock worried Fallon might fall, resulting in serious injury or death. Unbeknownst to the rest of the team, however, Rock and Fallon "cooled off" on the fire escape on hot days.

### D.    Death

On February 6, 2006, Rock picked up Fallon and drove her to the Ivers Building for work. Fallon was in a good mood, joking, laughing, and talking about the future. After they arrived, Fallon noticed some of the Ivers Building's resident employees were having a meeting. Fallon complained she was the only person working in the building and that was not fair. Rock verbally redirected Fallon. Rock explained the resident employees were having a meeting, just as Fallon occasionally met with her team.

While cleaning the sixth floor, Fallon's vacuum stopped working. Fallon became agitated and complained Rock was throwing "stuff" on the floor to create more work for Fallon. Rock again attempted to redirect Fallon verbally. Rock explained that Rock and Fallon would need to go downstairs and get another vacuum so Fallon could finish her work. Rock also told Fallon they would need to "process" the incident. Fallon agreed to go downstairs.

When Rock called the elevator, Fallon insisted upon using the stairs. Fallon proceeded to the stairs with her broken vacuum. Rock "withdrew attention" from Fallon and followed her down the stairs. Rock assumed Fallon was going to the ground floor to pick up a new vacuum, but Fallon exited the stairwell at the fifth floor. Rock then followed Fallon through a series of hallways. As Fallon navigated the fifth floor, Rock thought Fallon might be looking for a place to calm, such as an interior window ledge. On a previous occasion, Fallon sat down in the hallway after becoming frustrated with Rock. Although Fallon's designated calming place was on the main floor, it was not uncommon for Fallon to choose her own calming place.

To Rock's surprise and immediate consternation, Fallon suddenly slammed her vacuum down and accelerated to a door leading to the fire escape. Rock was worried Fallon might use the fire escape to leave the Ivers Building, but Rock did not have an opportunity to stop Fallon from walking outside. Fallon glanced at Rock, opened the door, and walked onto the fire escape. The door closed behind Fallon.

Rock ran to the fire escape, pushed open the fire escape door, and saw Fallon sitting on the first step of the fire escape stairs leading up to the sixth floor. Fallon was not agitated and appeared to be calming. Rock wanted to cajole Fallon inside but worried physical intervention might agitate Fallon and cause her to run or possibly fall down the fire escape stairs. Rock decided against climbing onto the fire escape, instead propping the door open with her foot.

Rock told Fallon she should come back inside the Ivers Building, because it was cold outside and they needed to process. Fallon refused. Rock made two cellular telephone calls for backup. Solutions did not answer the first call, but on the second call Rock was able to reach Heartland. Benson's supervisor, Kerry Larson, told Rock that Larson would send Chris Fester to help Rock process with Fallon. Larson directed Rock to tell Fallon about Fester's impending arrival to motivate Fallon to

come inside. Rock told Fallon that, if Fallon did not come inside within five minutes, Rock would call Fester to help Rock and Fallon process.

Fallon stood up and faced Rock. Rock initially thought Fallon was coming back inside the Ivers Building, but Fallon suddenly threw her belongings down onto the deck of the fire escape, turned away from Rock, grabbed the fire escape's railing, bent her knees, and jumped off the fire escape. Rock pushed the fire escape door open when Fallon grabbed the railing, and reached for Fallon, but Rock could not stop Fallon from jumping. Fallon died from injuries sustained in her fall.

### E.      Prior Proceedings

In 2007, Zebley filed this wrongful death action in the district court against Heartland, "individually and as surviving mother of" Fallon. Zebley alleged Heartland's purported negligence was the direct and proximate cause of Fallon's death. Zebley pled three specifications of negligence: (1) failure to supervise Fallon properly; (2) failure to train Rock properly; and (3) "[f]ailure to develop and implement an appropriate program to protect Fallon from danger associated with her disability and medical condition."

In 2008, the district court presided over an eight-day jury trial. The jury returned a verdict adverse to Zebley, finding Heartland was not "at fault in connection with the death" of Fallon. The district court entered judgment in Heartland's favor. Zebley filed a motion for judgment as a matter of law or, in the alternative, for a new trial, pursuant to Fed. R. Civ. P. 50 and 59 (post-trial motion), which Heartland resisted. The district court denied Zebley's post-trial motion, and Zebley appeals.

## II.      DISCUSSION

Zebley argues the district court erred in (1) instructing the jury on sudden emergency and on hindsight, and (2) denying the post-trial motion. We examine these two issues, in turn, after examining our jurisdiction. See Clark v. Baka, 593 F.3d 712,

714 (8th Cir. 2010) (recognizing "every federal appellate court has a special obligation to consider its own jurisdiction," even if it must do so <u>sua</u> <u>sponte</u>) (quoting <u>McAdams v. McCord</u>, 533 F.3d 924, 927 (8th Cir. 2008)).

### A.    Jurisdiction

Zebley invoked the district court's diversity jurisdiction under 28 U.S.C. § 1332(a)(1), alleging the parties were citizens of different states and the amount in controversy exceeded $75,000, exclusive of interest and costs. Zebley is a resident of Fargo, North Dakota, and Heartland is a Minnesota corporation with its principal place of business in Moorhead, Minnesota.

Before answering Zebley's complaint, Heartland moved to dismiss under Fed. R. Civ. P. 12(b)(1) for want of subject matter jurisdiction. Noting Fallon lived in Moorhead, Heartland argued 28 U.S.C. § 1332(c)(2) destroyed diversity by deeming Zebley to be a citizen of Minnesota.[4] In relevant part, § 1332(c)(2) provides that "the legal representative of the estate of a decedent shall be deemed to be a citizen only of the same State as the decedent." The district court denied Heartland's motion. <u>See</u> <u>Zebley v. Heartland Indus. of Dawson, Inc.</u>, No. 2:07-CV-23, 2007 WL 2297196, at *2-*3 (D.N.D. Aug. 6, 2007).

We agree with the well-reasoned decision of the district court. Section 1332(c)(2) is inapplicable because Zebley did not sue Heartland as "the legal representative of [Fallon's] estate." Notwithstanding the fact Zebley styled her complaint as a common law negligence action, Zebley sued Heartland in her capacity as trustee for Fallon's heirs under North Dakota's wrongful death statute, N.D. Cent. Code §§ 32-21-01, <u>et</u> <u>seq</u>. <u>See also</u> <u>Armstrong v. Miller</u>, 200 N.W.2d 282, 284 (N.D. 1972) ("At common law no action would lie to recover damages for the wrongful death of a person. . . . The right of action for wrongful death is statutory."). North

---

[4]Heartland now disavows this argument and concedes jurisdiction.

Dakota's wrongful death statute provides that any recovery on behalf of the decedent does not redound to the decedent's estate, but instead "inure[s] to the exclusive benefit of the decedent's heirs at law in such shares as the judge . . . shall fix." N.D. Cent. Code § 32-21-04. Although we have not previously analyzed the interplay between North Dakota's wrongful death statute and 28 U.S.C. § 1332(c)(2), we have found diversity jurisdiction to be present in analogous circumstances. See Steinlage v. Mayo Clinic Rochester, 435 F.3d 913, 917-20 (8th Cir. 2006) (examining 28 U.S.C. § 1332(c)(2) and Minn. Stat. § 573.02 which created a wrongful death cause of action). The district court had subject matter jurisdiction under 28 U.S.C. § 1332(a), and a fortiori we have jurisdiction under 28 U.S.C. § 1291.

### B.    Jury Instructions
#### 1.    Standard of Review

Our standard of review is narrow with respect to Zebley's complaints about the jury instructions.

> We review a district court's jury instructions for an abuse of discretion. A district court possesses broad discretion in instructing the jury, and jury instructions do not need to be technically perfect or even a model of clarity. Our review is limited to whether the jury instructions, taken as a whole, fairly and adequately represent the evidence and applicable law in light of the issues presented to the jury in a particular case. When sitting in diversity, a district court's jury instructions must fairly and adequately represent the law of the forum state. . . . And, even if we find that a district court erroneously instructed the jury, we will reverse only where the error affects the substantial rights of the parties.

McCoy v. Augusta Fiberglass Coatings, Inc., 593 F.3d 737, 744-45 (8th Cir. 2010) (citations and internal marks omitted).

## 2.    Sudden Emergency

Over Zebley's objection, the district court gave the jury a sudden emergency instruction.  Final Jury Instruction No. 10 provided:

> If suddenly faced with a dangerous situation the person did not create, the person is not held to the same accuracy of judgment as one would be if there were time for deliberation.  The person is not at fault if the person acted as an ordinary prudent person would act in a similar emergency.

Zebley renewed her objection to the district court's sudden emergency instruction in her post-trial motion.

Zebley argues the sudden emergency instruction was improper because Rock "created the emergency of Fallon being on the fire escape in the first place."  Zebley excoriates Rock for "play[ing] a major part in creating the sudden emergency or danger." Zebley points out Rock was responsible for Fallon's safety and, among other things, was aware of Fallon's unsteady gait, poor judgment, lack of impulse control, history of falling down stairs, and suicidal ideation.  Zebley stresses Fallon's fall was foreseeable to Rock, because Rock admits being wary about Fallon working in the Ivers Building.  Zebley surmises the sudden emergency instruction "prejudicially lowered the standard of care."

The district court did not abuse its discretion in giving the sudden emergency instruction.  The sudden emergency instruction was relevant to one of the issues in the case—Rock's response to at least the final part of Fallon's conduct—and correctly stated the law.

In Ebach v. Ralston, 510 N.W.2d 604 (N.D. 1994), the trial court gave a materially similar sudden emergency instruction to the jury.  Id. at 608-09.  The Ebachs were injured in an automobile accident and claimed the defendant, Ralston,

-10-

negligently created a sudden emergency and then acted negligently during such emergency. Id. at 610. The Ebachs argued the sudden emergency instruction suggested a lower standard of care and warranted reversal. Id. at 608-09.

The North Dakota Supreme Court recognized the sudden emergency doctrine was under siege in some jurisdictions, "because the typical sudden emergency instruction may suggest a lower standard of care for a sudden emergency, thus confusing responsibility for accidents under comparative negligence principles, and because it adds little to ordinary negligence instructions." Id. at 609.[5] Nonetheless, the court affirmed the trial court's "carefully drafted" sudden emergency instruction. Id. at 610-11. The court stressed the sudden emergency instruction, which "direct[ed] that the emergency must not be created by the fault of the person claiming the emergency," was given in conjunction with an ordinary negligence instruction and did not unduly emphasize the sudden emergency doctrine. Id. at 610. The court concluded the trial court's sudden emergency jury instruction

> g[a]ve adequate guidance to the jury and latitude to the parties to argue that a sudden emergency may have been caused by the [defendant]'s lack of prior care and should have been anticipated. . . . The court's instructions allowed the Ebachs to present evidence and argue that Ralston failed to exercise ordinary care in operating his truck both before and during the alleged emergency. Those instructions do not require a different standard of care than ordinary negligence . . . . [T]he jury

---

[5]Elsewhere, the North Dakota Supreme Court has explained "the focus for determining tort liability has been shifted from traditional, doctrinal labels to the singular, inclusive concept of 'fault,'" Erickson v. Schwan, 453 N.W.2d 765, 768 (N.D. 1990), and has characterized the sudden emergency instruction as "not indispensable," Kreidt v. Burlington N. R.R., 615 N.W.2d 153, 156 (N.D. 2000). The North Dakota Supreme Court has not, however, forbidden giving the instruction. Cf. McClymont v. Morgan, 470 N.W.2d 768, 771-72 (Neb. 1991); Simonson v. White, 713 P.2d 983, 989-90 (Mont. 1986); Knapp v. Stanford, 392 So. 2d 196, 198-99 (Miss. 1980).

instructions, as a whole, correctly and adequately advised the jury on Ralston's duty to exercise ordinary care under the circumstances.

Id. at 610-11 (citations omitted).

The same analysis applies with equal force here. Final Jury Instruction No. 10 accurately states the sudden emergency doctrine, reminding the jury that such doctrine does not apply to self-created emergencies. Taken as a whole, the district court's instructions allowed Zebley to present evidence and argue Heartland's negligence created the emergency. In other instructions, the district court emphasized ordinary principles of negligence governed and accurately stated the general principles of comparative fault. Instruction No. 10 does not purport to require a standard of care lower than ordinary negligence.

### 3.     Hindsight

Over Zebley's objection, the district court gave the jury a hindsight instruction. Final Jury Instruction No. 9 provided:

> In considering past conduct, you are not to use hindsight. Negligence, as applicable here, is based upon what a reasonable person, while exercising ordinary care, would have foreseen and would have done in the light of reasonable foresight under the circumstances then existing. The foreseeability contemplated by this instruction is not that the exact harm was foreseeable, it is sufficient that the risk of harm be generally foreseeable. The hallmark of ordinary care in this circumstance is what a reasonable and prudent person, while exercising ordinary care, would have done under the same or similar circumstances.

Zebley renewed her objection to the district court's hindsight instruction in her post-trial motion.

Zebley argues the district court's hindsight instruction is unprecedented and unjustified—unprecedented because "[t]here is no North Dakota law supporting this type of instruction in a negligence case" and unjustified because Heartland did not adduce any "after acquired [sic] facts" tending to show Fallon's death was unforeseeable. Zebley maintains "[t]he instruction required the jury to ignore the foreseeability of the dangers associated with Fallon being on the fire escape, to ignore expert testimony, and to unduly focus on Rock's and Fallon's actions immediately before Fallon fell when she was already on the fire escape." Zebley points out Heartland referred to the hindsight instruction during closing argument to discredit Zebley's expert witness, Dr. Kevin Schumacher.[6]

The district court did not abuse its discretion in giving the hindsight instruction. The district court's hindsight instruction correctly stated North Dakota law. See Martinson Bros. v. Hjellum, 359 N.W.2d 865, 874 (N.D. 1985) (remarking in a negligence action that "[c]riticism in hindsight of one of many courses of action is not probative of negligence") (quotation omitted); Bjerke v. Heartso, 183 N.W.2d 496, 502 (N.D. 1971) (stating negligence must be determined "without the aid of hindsight"). The instruction embodies the familiar principle that foresight, not hindsight, is the measure of negligence. Cf. Oceanic Steam Navigation Co. v. Aitken, 196 U.S. 589, 595-96 (1905) (Holmes, J.) ("[N]egligence must be determined upon the facts as they appeared at the time, and not by a judgment from actual consequences which then were not to be apprehended by a prudent and competent man."); Klisch v. Meritcare Med. Group, 134 F.3d 1356, 1359 (8th Cir. 1998) (applying Minnesota law and affirming the use of a similar hindsight instruction which charged the jury that "[f]oresight, not hindsight, is the standard of negligence"). Far from directing the jury to ignore relevant evidence, the hindsight instruction echoed Instruction No. 5, the district court's general negligence instruction, by stressing that "[t]he hallmark of

_____

[6]Zebley did not object during closing argument.

ordinary care in this circumstance is what a reasonable and prudent person, while exercising ordinary care, would have done under the same or similar circumstances."

Zebley's allegation of prejudice concerning Heartland's reference to the hindsight instruction during closing argument is speculative. Dr. Schumacher testified he "backtracked" from the fact Fallon died while in Heartland's care "to see what happened that day, . . . whether there were parts of the . . . [BPP] that might have led to her death, whether there were decisions made that may reflect poor training . . . and whether there might have been judgments made that were not appropriate." In context, Heartland's reference to the hindsight instruction in closing merely reminded the jury that the jury should not use hindsight to "backtrack," but should instead focus on what was reasonably foreseeable on or before February 6, 2006. Cf. Diesel Mach., Inc. v. B.R. Lee Indus., Inc., 418 F.3d 820, 838-39 (8th Cir. 2005) (examining propriety of statement during closing argument in context to evaluate potential prejudice). Heartland's closing argument did not, as Fallon seems to suggest, encourage the jury to disregard Dr. Schumacher's testimony simply because he formed his opinion after the events in question. Indeed, if this were Heartland's closing argument, it would have undercut the testimony of Heartland's own expert witnesses.

### 4. Summary

On the whole, the district court's jury instructions fairly and adequately represented the evidence and applicable law in light of the issues presented. In any event, Heartland cannot demonstrate prejudice.

## C. Post-Trial Motion
### 1. Standards of Review

"We review a district court's denial of a motion for judgment as a matter of law de novo." Heaton v. The Weitz Co., 534 F.3d 882, 887 (8th Cir. 2008). "We 'must affirm the jury's verdict unless, after viewing the evidence in the light most favorable

to [Zebley], we conclude that no reasonable jury could have found in [her] favor.'" Id. (quoting Moysis v. DTG Datanet, 278 F.3d 819, 824 (8th Cir. 2002)). "We 'will not set aside a jury verdict unless there is a complete absence of probative facts to support the verdict.'" Id. (quoting Wilson v. Brinker Int'l, Inc., 382 F.3d 765, 769 (8th Cir. 2004)). "We review the district court's denial of [Zebley's] motion for a new trial for abuse of discretion, and give the district court's ruling high deference." PFS Distribution Co. v. Raduechel, 574 F.3d 580, 592 (8th Cir. 2009). "The crucial determination 'is whether a new trial should have been granted to avoid a miscarriage of justice.'" Id. at 589 (quoting Keeper v. King, 130 F.3d 1309, 1314 (8th Cir. 1997)).

### 2. Analysis

In her post-trial motion, Zebley argued there was insufficient evidence to support the jury's verdict and, in the alternative, there was so little evidence to support the verdict that the verdict represented a miscarriage of justice warranting a new trial. The gravamen of Zebley's argument, which she reasserts on appeal, was the trial evidence overwhelmingly demonstrated that Heartland neglected its duty to keep Fallon safe. Zebley opines the jury's verdict "defies common sense and logic and shows that the jury instructions affected the jury's verdict."

The district court did not err in denying the post-trial motion. There was sufficient evidence to support the jury's verdict, and the district court did not abuse its discretion in determining the verdict does not represent a miscarriage of justice. As indicated previously, the district court's sudden emergency and hindsight instructions correctly stated the law.

A reasonable jury also could find Heartland exercised ordinary care under the circumstances. Heartland's primary witness, Dr. David Mank, an expert in the field of supported employment services, testified the BPP was "very well constructed, . . . followed well and . . . there was no indication of . . . neglect of any kind." Dr.

Schumacher characterized the BPP as "beautifully written" and was unable to find fault in its terms.

A reasonable jury could find Fallon's suicide was unforeseeable. Fallon was in good spirits on the morning of her death. Over time, Fallon's behavior had improved substantially under Rock's supervision. Heartland inspected the Ivers Building for safety, Fallon lived without incident in a second-story apartment with access to a balcony, and Fallon had not fallen down stairs in approximately five years. One of Heartland's witnesses, Lori Flores, the Director of Divine House, opined Rock could not have anticipated Fallon was in imminent danger until the moment Fallon leaned over the fire escape's railing. Dr. Mank agreed.

A reasonable jury could believe Rock acted appropriately at all times on February 6, 2006. A reasonable jury could credit Rock's testimony that she lacked any opportunity physically to prevent Fallon from alighting the fire escape after Fallon slammed down her vacuum, notwithstanding Dr. Schumacher's speculation that Rock "could have physically intervened." A reasonable jury could find any further intervention once Fallon climbed onto the fire escape would only have made matters worse. Dr. Schumacher, Dr. Mank, and Flores agreed it would have exacerbated matters if Rock had tried to force Fallon inside the Ivers Building. Dr. Mank concluded Rock could not have foreseen Fallon would kill herself until she jumped. The evidence sufficiently supports the jury's verdict.

## III.  CONCLUSION
We affirm.

_____

-16-