# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

Nos. 11-1048/11-1162

_____

Sandra Der; Gordon Der, individually
and as parents and natural guardians
for G.D., a minor,

      Appellants,

v.

Sean Connolly, in his individual and
official capacity; Mike Ammend, in
his individual and official capacity;
Isanti County,

      Appellees.

Appeal from the United States
District Court for the
District of Minnesota.

_____

Submitted: October 19, 2011
Filed: January 25, 2012

_____

Before BYE, SMITH, and COLLOTON, Circuit Judges.

_____

SMITH, Circuit Judge.

Sandra and Gordon Der, individually and on behalf of their son G.D. sued, *inter alia*, Isanti County Deputy Sheriff Sean Connolly in his individual and official capacity under 42 U.S.C. § 1983 and relevant state law. The Ders sought damages for injuries allegedly suffered when Deputy Connolly entered their home without a

warrant. A jury returned a verdict in favor of Deputy Connolly, and the district court[1] denied the Ders' motion for a new trial. On appeal, the Ders seek a new trial, arguing that the district court gave erroneous jury instructions and made erroneous evidentiary rulings. We affirm.

## I. *Background*

"We recite the facts in the light most favorable to the jury's verdicts." *White v. McKinley*, 605 F.3d 525, 528 (8th Cir. 2010) (quotation and citation omitted).

On the afternoon of April 22, 2008, R.D., Sandra's teenage son from a previous marriage, returned home from school. When he came home, Sandra was lying on the couch. She began screaming, yelling, and swearing at R.D., accusing him of taking the phone out of her hand and hanging it up, even though the phone was next to her. Sandra also called R.D. a "pig" and told him that he was fat. R.D. believed that his mother was drunk because she was "acting weird" and "slurring her words." According to R.D., his mother's alcohol consumption had increased over the past couple of months. R.D. attributed the increase to his stepfather's absence. His stepfather, Gordon Der, was "on a trucking job" and "wasn't around much."

R.D. left the home and went to a friend's house, where he called his father, Terry Darby, and asked Terry to pick him up. R.D. then went to his father's residence, where he talked to his father and his stepmother, Heather Darby, about what occurred. R.D. told Heather that he was "concerned about [his] [five-year-old] little brother [G.D.] because . . . [his] mom was drunk." Heather called 911 to ask the police to conduct a welfare check on G.D.

---

[1]The Honorable Patrick J. Schiltz, United States District Judge for the District of Minnesota.

Deputy Connolly was dispatched to conduct the "welfare check on a five-year-old son and an intoxicated mother" at the Der residence. Deputy Connolly learned from information dispatched to his computer that "an anonymous caller had called in to dispatch stating that her 15-year-old had resided at this residence . . . and [he] went to the neighbor's house to get away from his mother due to the fact that she was intoxicated and he did not feel safe there." Additionally, the caller was concerned about the "status of the mother being intoxicated" and the welfare of the five-year-old son. Before arriving at the Der home, Deputy Connolly spoke to Heather, who gave him the same information that she had given dispatch, including her concern that the five-year-old son was sick and not getting the proper care, as he was with his "very drunk" mother.

At 9:45 p.m., Deputy Connolly arrived at the Der residence and knocked on the door for two to three minutes before "a female voice yelled out stop, knock it off." Deputy Connolly identified himself and stated that he needed to speak with her. When Sandra opened the door, Deputy Connolly explained to her that he needed her to step outside so that he could speak with her regarding a phone call that he had received concerning the welfare of her children. Deputy Connolly "noticed a strong odor of an alcoholic beverage" on Sandra and that she "had bloodshot, watery eyes." Sandra responded that Deputy Connolly could not enter the home and began shutting the door. Deputy Connolly could tell that Sandra was "a little bit more agitated." As she was shutting the door, Deputy Connolly stopped the door with his foot to prevent it from closing. He was still standing outside the front entrance. He again explained that he needed Sandra to step outside to discuss the welfare of her children. Sandra responded, "F**k you, you are not f*****g coming in, go away." She immediately attempted to shut the door. At that time, Deputy Connolly placed one of his hands on her wrist and tried to pull her outside the door to better control the environment and for his own safety.

Deputy Connolly let go of Sandra's wrist when two large, growling dogs appeared. Deputy Connolly told Sandra to restrain her dogs and put them away, but she refused. When he advised her that he would use force if the dogs tried to bite him, Sandra complied and secured the dogs. After putting the dogs away, Sandra returned to speak with Deputy Connolly. He again explained to her that he was only there to check on her children's welfare and her welfare based on a phone call that he received. He confirmed with Sandra that her five-year-old son was sick. She told Deputy Connolly that the child was upstairs. She then asked Deputy Connolly whether he "want[ed] to go upstairs to see him," and Deputy Connolly replied "yes." Thus, according to Deputy Connolly, Sandra consented to enter the home because "she basically said, yes, you can come up and check on my kid." According to Deputy Connolly, once Sandra understood that he was only there to complete a welfare check on her children, she became more compliant and less irritable and belligerent.

Sandra and Deputy Connolly then walked upstairs and into the living room where G.D. was lying on the couch. Deputy Connolly was concerned because G.D. "appeared sickly, lethargic, [and] very pale." While Deputy Connolly was evaluating G.D., Sandra began a telephone conversation; she raised her voice during the call. Deputy Connolly felt G.D.'s forehead and determined that the child had a high fever. Deputy Connolly then politely asked Sandra to end the phone call, but she refused. After asking additional times, Deputy Connolly explained to Sandra that her child was very sick. Sandra then ended the phone call. Deputy Connolly asked Sandra when she had last taken the child's temperature, and she replied "five to eight hours ago." Deputy Connolly recommended that she take his temperature again. Sandra took G.D.'s temperature, which was 102.9 degrees. Sandra agreed his condition required attention.

After Sandra gave G.D. fever medication, Deputy Connolly continued with his investigation. He asked for Sandra's identification and called dispatch to inquire whether Sandra had any outstanding warrants. Deputy Connolly then asked Sandra

if she had consumed any alcoholic beverages, and she indicated to him that she had one shot of hard liquor. Incredulous, Deputy Connolly told Sandra that she had bloodshot, watery eyes and a strong odor of alcohol. Deputy Connolly asked Sandra to consent to a portable breath test (PBT), and Sandra consented. The PBT indicated that Sandra had a blood-alcohol content of 0.20—over twice the legal limit.

To evaluate Sandra's child welfare awareness, Deputy Connolly asked if she knew R.D.'s whereabouts. Sandra responded that he was downstairs sleeping in the bedroom. Deputy Connolly suggested that Sandra go check on R.D., even though Deputy Connolly knew that R.D. was not there. After Sandra discovered R.D.'s absence, Deputy Connolly told Sandra that R.D. had left home because he felt unsafe due to her intoxication and was now with his father. Sandra then became agitated and began screaming at Deputy Connolly.

Deputy Connolly informed Sandra that, based on his observations of her, her intoxication, and the information that he had received from dispatch, he did not feel that she could properly care for G.D. Deputy Connolly told Sandra that she needed to find someone to take care of G.D. In response, Sandra "got pretty upset," stating that she was "perfectly capable" of taking care of G.D. Deputy Connolly told her that he wanted someone at the home until she sobered up to take care of G.D. Sandra did not want to contact a family member to look after G.D. Deputy Connolly explained that the next option was to call Family Services. Sandra then "went into a rage." She yelled, "I have a gun, I knew you were a cop out there, if I was going to answer the door and you would have come in, I would have shot ya." Considering this threat and Sandra's irrational state, Deputy Connolly decided to handcuff Sandra for everyone's safety. Deputy Connolly asked Sandra to turn around and put her hands behind her back; he informed her that she was not under arrest. Sandra did not initially comply; instead, she asked why Deputy Connolly was putting her in handcuffs. Sandra eventually placed her hands behind her back. Deputy Connolly reached for one of her wrists, and Sandra pulled away. Deputy Connolly eventually handcuffed Sandra.

Deputy Connolly then asked Sandra to sit, but she refused to comply. Deputy Connolly repeatedly told her to sit down.

After Sandra was handcuffed, Deputy Connolly spoke by phone with her husband and other family members to arrange for someone to come to the home. After a family member arrived, Deputy Connolly removed Sandra's handcuffs and left the residence.

The Ders, individually and on behalf of their son, G.D., subsequently brought suit under § 1983 and state law against, *inter alia*, Deputy Connolly. The lawsuit sought damages for injuries allegedly suffered when Deputy Connolly entered their home without a warrant. The Ders principally claimed that Deputy Connolly violated their Fourth Amendment rights by unreasonably entering their home, using excessive force against Sandra as he was entering the home, conducting an unreasonable search of the Ders' home after he entered it, unreasonably seizing Sandra when he placed her in handcuffs, and using excessive force against Sandra in connection with handcuffing her. After a four-day trial, the jury found in favor of Deputy Connolly.

The Ders filed a motion for new trial, arguing, *inter alia*, that the district court erred in (1) failing to assign Deputy Connolly the burden of proof regarding Sandra's alleged consent and whether an emergency or exigent circumstances existed in the Ders' home at the time of his entry, (2) instructing the jury as to what constitutes "exigent circumstances" justifying a warrantless entry into the home, (3) failing to exclude the purported results of the PBT given to Sandra as unreliable and unduly prejudicial, and (4) failing to admit evidence regarding a subsequent event involving Deputy Connolly's entry into another individual's home pursuant to Federal Rule of Evidence 404(b). The district court denied the motion.

## II. *Discussion*

On appeal, the Ders argue that the district court erred in (1) instructing the jury that, to prevail on their Fourth Amendment claim, the Ders had the burden of proving that Sandra did not consent to Deputy Connolly's entrance into the home and that it was objectively unreasonable for Deputy Connolly to believe that an emergency requiring his attention existed within the home, (2) instructing the jury that, under the emergency aid doctrine, an emergency exists if a person needs immediate aid, (3) admitting Sandra Der's PBT result, and (4) excluding evidence of a subsequent event involving Deputy Connolly.

"Under Rule 59, the decision to grant a new trial lies within the sound discretion of the trial court, and its decision will not be reversed on appeal absent a clear abuse of that discretion." *Haigh v. Gelita USA, Inc.*, 632 F.3d 464, 471 (8th Cir. 2011) (quotation and citation omitted). "The key question in determining whether a new trial is warranted is whether it is necessary to prevent a miscarriage of justice." *Id*.

### A. *Burden-of-Proof Instruction*

During final jury instructions, the district court generally instructed the jury that its verdict would

> depend on whether, in light of all of the evidence, you find that certain facts have been proved. The burden of proving a fact is upon the party whose claim or defense depends upon that fact. The party who has the burden of proving a fact must prove it by the greater weight of the evidence. To prove something by the greater weight of the evidence is to prove that it is more likely true than not true.

Thereafter, the district court instructed the jury regarding the Ders' claim of unreasonable entry into their home, stating:

-7-

Under the Fourth Amendment, an entry into a person's home is a type of search. The Fourth Amendment therefore forbids a government official to unreasonably enter a person's home.

Sandra, Gordon, and [G.D.] contend that Connolly violated their Fourth Amendment rights by unreasonably entering their home. To prevail on this claim, the Ders must prove the following two things:

(1) Sandra Der did not knowingly and voluntarily consent to Connolly's entrance into the home; and

(2) it was objectively unreasonable for Connolly to believe that an emergency requiring his attention existed within the home.

On appeal, the Ders assert that the district court improperly shifted the burden of proving the affirmative defenses of consent and exigent circumstances to them. This court reviews for an abuse of discretion a district court's jury instructions. *Zebley v. Heartland Indus. of Dawson, Inc.*, 625 F.3d 449, 455 (8th Cir. 2010). "A district court possesses broad discretion in instructing the jury, and jury instructions do not need to be technically perfect or even a model of clarity." *Id.* (quotation and citation omitted). We limit our review "to whether the jury instructions, taken as a whole, fairly and adequately represent the evidence and applicable law in light of the issues presented to the jury in a particular case." *Id.* (quotation and citation omitted). "[E]ven if we find that a district court erroneously instructed the jury, we will reverse only where the error affects the substantial rights of the parties." *Id.* (quotation and citation omitted).

In support of their argument, the Ders cite *Creighton v. City of St. Paul*, 766 F.2d 1269, 1272 (8th Cir. 1985), *vacated sub nom. Anderson v. Creighton*, 483 U.S. 635 (1987), as "finding that law enforcement officers bear the burden of proving that

an exception to the warrant requirement exists in a civil action for unlawful entry of a home pursuant to 42 U.S.C. § 1983." But, as the district court correctly concluded

> language in *Creighton v. City of St. Paul*, 766 F.2d 1269 (8th Cir.1985), can be read to support placing the burden on either the plaintiff or the defendant. *Compare id*. at 1272–73 (holding that defendant police officer "was not entitled to summary judgment because he has not proved . . . that he had probable cause" for a warrantless entry) *with id*. at 1277 ("If the [plaintiffs] can prove that the officers did not ask for permission to enter and did not explain their mission . . . then . . . the jury could find that the entry was not peaceable.").

*Der v. Connolly*, No. 08-CV-6409 (PJS/JJG), 2011 WL 31498, at *2 (D. Minn. Jan. 5, 2011) (slip copy).

The Ders also cite *Patzner v. Burkett*, 779 F.2d 1363 (8th Cir. 1985), but *Patzner* is inapposite; it involved a district court's grant of summary judgment, not a jury trial on the ultimate issue of whether a § 1983 violation occurred. *Id*. at 1366. We concluded that no genuine issues of material fact existed and that, as a matter of law, the officers' justifications for entry into the home failed. *Id*. at 1369. We made no definitive holding on the allocation of the burden of proof in a § 1983 case.

Instead, as the district court correctly noted, this court "has not expressly decided who bears the burden of proof in a § 1983 action for a warrantless arrest or search." *Der*, 2011 WL 31498, at *2. We do so now. Two views currently prevail among our sister circuits. A majority of the circuits place the burden of *proof* on the plaintiff in a § 1983 action for a warrantless arrest or search, with some of those circuits imposing the burden of *production* on the defendant.[2] A minority of the

---

[2] *See, e.g.*, *Bogan v. City of Chi.*, 644 F.3d 563, 568–71 (7th Cir. 2011) (holding that once police officers came forward with evidence of exigent circumstances justifying their warrantless search of plaintiff's apartment, in plaintiff's § 1983 action,

-9-

plaintiff bore ultimate burden of showing that officers did not reasonably believe that suspect for whom they were searching would be found in resident's apartment; officers did not bear burden of proving existence of exigent circumstances); *Pavao v. Pagay*, 307 F.3d 915, 919 (9th Cir. 2002) ("In a civil case under 42 U.S.C. § 1983, however, the plaintiff carries the ultimate burden of establishing each element of his or her claim, including lack of consent."); *Dubner v. City & Cnty. of San Francisco*, 266 F.3d 959, 965 (9th Cir. 2001) ("Although the plaintiff bears the burden of proof on the issue of unlawful arrest, she can make a prima facie case simply by showing that the arrest was conducted without a valid warrant. At that point, the burden shifts to the defendant to provide some evidence that the arresting officers had probable cause for a warrantless arrest. The plaintiff still has the ultimate burden of proof, but the burden of production falls on the defendant."); *Rankin v. Evans*, 133 F.3d 1425, 1436 (11th Cir. 1998) (holding, in a warrantless-arrest case, that although the "defendants had the burden of demonstrating the existence of probable cause as a defense to the state claim," the "plaintiffs had the burden of demonstrating the absence of probable cause in order to succeed in their § 1983 claim"); *Valance v. Wisel*, 110 F.3d 1269, 1279 (7th Cir. 1997) ("The presumption [of unreasonableness arising from a warrantless search] merely serves to impose on the defendant 'the burden of going forward with evidence to meet or rebut the presumption' [(Fed. R. Evid. 301)], which a defendant would do by presenting evidence that the plaintiff consented to the search. In order to prove that the search was unreasonable, then, the plaintiff would be required to show either that he never consented or that the consent was invalid because it was given under duress or coercion."); *Ruggiero v. Krzeminski*, 928 F.2d 558, 563 (2d Cir. 1991) (acknowledging that "searches and seizures conducted without warrants are presumptively unreasonable" and determining that "the presumption may cast upon the defendant the duty of producing evidence of consent or search incident to an arrest or other exceptions to the warrant requirement" and that "the ultimate risk of nonpersuasion must remain squarely on the plaintiff"); *Crowder v. Sinyard*, 884 F.2d 804, 825–26 (5th Cir. 1989) (disagreeing "that the burden of proof in a section 1983 case based upon an alleged fourth amendment violation should be shifted to state officials once the plaintiff establishes that the officials' actions were not authorised by a warrant" and holding that "the burden of proof on the issue of whether the items seized were in plain view rests on the plaintiff in a section 1983 action based upon a warrantless search which defendants seek to justify under that exception to the warrant requirement"), *overruled in part on other grounds by Horton v. California*, 496 U.S. 128 (1990) .

circuits place the burden of proof on the defendant in a § 1983 action. *See, e.g.,* *Armijo ex rel. Armijo Sanchez v. Peterson*, 601 F.3d 1065, 1070 (10th Cir. 2010) (stating, in the context of a § 1983 action, "[t]he officers bear the burden of establishing that the threats posed exigent circumstances justifying the warrantless entry"); *Hardesty v. Hamburg Twp.*, 461 F.3d 646, 655 (6th Cir. 2006) (concluding the government bears the burden of proving the presence of exigent circumstances justifying the warrantless entry); *Parkurst v. Trapp*, 77 F.3d 707, 711 (3d Cir. 1996) ("To excuse the absence of a warrant, the burden rests on the State to show the existence of [exigent circumstances]."); *Tarter v. Raybuck*, 742 F.2d 977, 980–81 (6th Cir. 1984) (holding that school officials bore the burden of demonstrating a student's voluntary relinquishment of the constitutional protection against unreasonable searches in light of the "presumption against the waiver of constitutional rights"); *Losch v. Borough of Parkesburg*, 736 F.2d 903, 909 (3d Cir. 1984) (commenting that, in a § 1983 action for malicious prosecution, the "defendants bear the burden at trial of proving the defense of good faith and probable cause").

Having reviewed the relevant case authority, we agree with the majority of our sister circuits' "formulation of the proper allocation of the parties' burdens in a section 1983 action alleging a Fourth Amendment violation." *Valance*, 110 F.3d at 1279. We have previously recognized that "plaintiffs ordinarily retain the burden of proof throughout the trial" in a suit "brought pursuant to 42 U.S.C. § 1983." *Clark v. Mann*, 562 F.2d 1104, 1117 (8th Cir. 1977). Thus, "employing a criminal burden of proof [in a § 1983 civil action] is contrary to established principles governing civil trials, namely, that the ultimate risk of nonpersuasion must remain squarely on the plaintiff." *Bogan*, 644 F.3d at 570 (quotations and citations omitted). As the Seventh Circuit explained, "[e]ven if a presumption of unreasonableness arises from the fact of a warrantless search [or entry], that does not serve in a civil case to shift 'the burden of proof in the sense of the risk of nonpersuasion.'" *Valance*, 110 F.3d at 1279 (quoting Fed. R. Evid. 301). Instead, such "presumption merely serves to impose on the defendant 'the burden of going forward with evidence to meet or rebut the

-11-

presumption.'" *Id*. (quoting Fed. R. Evid. 301). A defendant may satisfy this burden of production by "produc[ing] evidence of consent or of some other recognized exception to the warrant requirement." *Id*. at 1278. "Yet once the defendant has done so, 'the ultimate risk of nonpersuasion must remain squarely on the plaintiff in accordance with established principles governing civil trials.'" *Id*. (quoting *Ruggiero*, 928 F.2d at 563).

For example, in *Bogan*, the district court instructed the jury that for the plaintiff to succeed on her § 1983 claim that police officers violated her Fourth Amendment rights when they entered and searched her apartment without a warrant, the plaintiff

> must prove by a preponderance of the evidence that a reasonable officer in the defendant's position would not have believed that a crime suspect was in [the plaintiff's] home [i.e., the "hot pursuit" exception to the warrant requirement].

644 F.3d at 567. On appeal, the plaintiff asserted that "the district court's instruction on burden of proof constituted reversible error" because "the burden of proof fell on the officers to establish that their actions were justified by exigent circumstances." *Id*. at 568. The court rejected the plaintiff's argument, concluding that "[t]he district court's instruction on burden of proof correctly and clearly stated the law, and, consequently, we find no error on this basis." *Id*. at 571.

Here, as in *Bogan*, the district court's jury instruction on the burden of proof "correctly and clearly stated the law," *id*., by instructing the jury that the Ders bore the burden of proving that Sandra "did not knowingly and voluntarily consent to Connolly's entrance into the home" and that "it was objectively unreasonable for Connolly to believe that an emergency requiring his attention existed within the home." At trial, Deputy Connolly satisfied his burden of production by producing evidence of Sandra's consent and that an emergency existed within the home, both of

which are recognized exceptions to the warrant requirement. *See Valance*, 110 F.3d at 1278. As a result, "'the ultimate risk of nonpersuasion . . . remain[ed] squarely on the [Ders] in accordance with established principles governing civil trials.'" *Id*. (quoting *Ruggiero*, 928 F.2d at 563).

Therefore, we hold that the district court did not err in instructing the jury on who bore the burden of proof.

## B. *Emergency-Aid-Doctrine Instruction*

During closing arguments, the Ders' counsel argued that "[t]here has to be something compelling, something life threatening" for the emergency aid doctrine to justify an officer's warrantless entry into the home. Prior to giving the final jury instructions, the district court corrected counsel's assertion that "there is not an emergency unless there is a life-threatening situation in the house." The court informed the jury that "for purposes of our case today an emergency exists if a person needs immediate aid. A person can need immediate aid even if his life is not in danger." Thereafter, the district court instructed the jury that

> [f]or purposes of these instructions, *an "emergency" exists if a person needs immediate aid*. In deciding whether it was objectively unreasonable for Connolly to believe that an emergency requiring his attention existed within the home, you must not consider Connolly's subjective intent. The question is not whether Connolly himself believed that an emergency requiring his attention existed within the Ders' home. Rather, the question is whether, given all of the circumstances known to Connolly at the time that he entered, a reasonable officer in Connolly's position—without the benefit of hindsight—would have believed that such an emergency existed.

(Emphasis added.)

The Ders argue that the district court erred in failing to define the nature and extent of the emergency required to justify a warrantless entry of a private home. According to the Ders, the district court misinterpreted *Michigan v. Fisher*, 130 S. Ct. 546 (2009) (per curiam), in ruling that there need not be an underlying "serious" harm to justify a warrantless entry pursuant to the emergency aid exception of the exigent circumstances doctrine.

Contrary to the Ders' argument, the district court's instruction correctly recited the Supreme Court's description of an "emergency," as the instruction directly quoted the "immediate aid" language used in *Fisher*. In that case, the Court explained that the "emergency aid exception" "requires only an objectively reasonable basis for believing that a person within the house is in need of immediate aid." *Id*. at 548 (quotations, citations, and alteration omitted). Furthermore, contrary to the "danger to life or limb" instruction that the Ders requested, the Court stated that "[o]fficers do not need ironclad proof of 'a likely serious, life-threatening' injury to invoke the emergency aid exception." *Id*. at 549.

Accordingly, we hold that the district court did not err in instructing the jury regarding the emergency aid exception.

### C. *Admission of Portable Breath Test Results*

During trial, Deputy Connolly testified regarding the PBT that he gave Sandra and its results. Immediately after this testimony, the district court gave the following limiting instruction:

> Members of the jury, you have heard testimony both from Ms. Der and now from Deputy Connolly about the result of a preliminary breath test, or what's called a PBT, that Deputy Connolly administered to Sandra Der after he entered her house. You may use this evidence, that is the evidence of the result of the PBT, for one reason and one reason only. You may consider this evidence in deciding whether Deputy

-14-

Connolly's actions after he administered the PBT were objectively reasonable.

The PBT result, whether accurate or inaccurate, was a piece of information that was known to Deputy Connolly and, thus, you may consider the PBT result, along with all the other information that was known to Deputy Connolly, in deciding whether Deputy Connolly acted reasonably after he administered the test.

I instruct you, though, that you must not use the PBT result for any other reason. For example, you must not consider the PBT result in deciding whether Deputy Connolly's actions before he administered the test, such as his actions in entering the Ders' home, were reasonable. Obviously, he took those actions before he administered the PBT and, thus, the result of the PBT is irrelevant to the reasonableness of those actions.

In addition, you must not consider the PBT result as evidence of whether Mrs. Der was in fact intoxicated. No evidence will be introduced in this trial about the accuracy or the lack of accuracy of the PBT and, thus, you must not consider the results of the PBT as evidence of whether Mrs. Der was in fact intoxicated.

Again, you may consider the PBT result only in deciding whether Deputy Connolly acted reasonably after he administered that test.

During final instructions, the district court again cautioned the jury that it could only consider the PBT result "in deciding whether Connolly's actions after he administered the PBT were objectively reasonable." The district court stressed that the jury could "not use the PBT result for any other reason," such as "whether Connolly's actions before he administered the test . . . were reasonable" or "whether Sandra Der was in fact intoxicated."

The Ders assert that the district court erred in admitting what they consider the unduly prejudicial evidence of the alleged PBT result. They contend that the evidence

-15-

unfairly damaged Sandra's credibility and permitted the jury to make the inappropriate inference that there was scientific evidence supporting Deputy Connolly's claim that Sandra was intoxicated.

"A district court enjoys wide discretion in ruling on the admissibility of proffered evidence, and evidentiary rulings should only be overturned if there was a clear and prejudicial abuse of discretion." *Quigley v. Winter*, 598 F.3d 938, 946 (8th Cir. 2010) (quotation and citation omitted).

A PBT lacks sufficient reliability to be admitted as substantive evidence. However, a PBT is admissible to establish probable cause. *United States v. Iron Cloud*, 171 F.3d 587, 590 (8th Cir. 1999); *see also Sherbrooke v. City of Pelican Rapids*, 577 F.3d 984, 987–88 (8th Cir. 2009) (holding, in § 1983 action for violation of Fourth Amendment rights, that police officer had probable cause under state law to effectuate arrest of plaintiff for driving under the influence when, *inter alia*, the plaintiff "registered .11 on the PBT").

Here, the district court did not admit the PBT result as substantive evidence of Sandra's intoxication. Instead, the court expressly limited its permissible use by the jury to determining whether Deputy Connolly acted reasonably after he administered the test—for example, in handcuffing Sandra. As noted, the district court gave *two* limiting instructions to ensure that the jury used the PBT result for this limited purpose. "The court's limiting instructions minimized the danger of unfair prejudice." *Bennett v. Nucor Corp.*, 656 F.3d 802, 812 (8th Cir. 2011).

Thus, we hold that the district court did not abuse its discretion in admitting the PBT result for the limited purpose of determining the reasonableness of Deputy Connolly's actions after he administered the test.[3]

## D. *Exclusion of Subsequent Event Involving Deputy Connolly*

At a status conference prior to trial, the Ders sought to introduce evidence of a subsequent incident involving Deputy Connolly. This incident also included a disputed home entry. The Ders had submitted an offer of proof of the homeowner's testimony. Upon reviewing the proffer, the district court commented that this evidence appeared to be "just plain old character evidence." The court discussed the nature of the testimony and the distinguishing facts between that incident and the Ders' case. The court noted that the use of the evidence was "primarily as character evidence." The court commented that the proffered evidence went mainly to show what Deputy Connolly was thinking subjectively. The court correctly viewed Deputy Connolly's subjective intent as largely immaterial. The court observed that "for at least the five federal constitutional claims," the test is "an objective test, not what was on the mind of the actual officer, but what a reasonable officer would have concluded under the circumstances." Thus, the court did not believe that the Ders could show

---

[3]We find meritless the Ders' additional argument that a prior advisory ruling of the district court "*forced* Appellants to reinstate their former claims in order to fully present evidence of the traumatic events that followed Deputy Connolly's unlawful entry into the Der home." (Emphasis added.) According to the Ders, they informed the district court of their "desire to proceed to trial on four claims centered on the unlawful entry and Deputy Connolly's use of excessive force to enter the Der home." In response, the district court ruled that it "would be much more restrictive in letting evidence in of what happened after Deputy Connolly entered the home." The Ders contend that this "advisory ruling" "resulted in the [d]istrict [c]ourt committing reversible error by admitting evidence of the prejudicial PBT result suggesting Sandra Der was drunk that would otherwise have been inadmissible." Whatever the impact of this "advisory ruling," the Ders made the independent determination to proceed on all of their claims, including those concerning Deputy Connolly's conduct after entering the home.

"how Connolly's actions at the [subsequent] house made it more or less likely that Connolly had a plan or he had some intent or some motive."

The court further concluded that even if the incident was relevant to intent, it would exclude the evidence under Federal Rule of Evidence 403 because "[t]he probative value of intent is slight." According to the court, the evidence's probative value "would be substantially outweighed by the danger of unfair prejudice" because "it's far more likely the jury will use the forbidden inference—that is, the inference that Connolly is a bad guy and that's why he likely did what plaintiffs accuse him of." The court also had a "huge concern" about "undue delay and waste of time" because, "[t]o find out whatever probative value the [other] incident has[,] we would essentially have to try the [other] incident." The court noted that it was "not going to try two lawsuits here." Thus, the court denied the Ders' motion to admit the evidence, excluding it both under Rules 404 and 403. It ordered "both parties to say nothing about the [other] incident at the trial."

We hold that the district court did not err in excluding the proffered testimony of a subsequent home-entry incident involving Deputy Connolly. Our precedent holds that "issues of motive and intent are essentially irrelevant" in § 1983 cases involving claims of excessive force, unreasonable search, and unreasonable entry. *Morgan v. City of Marmaduke, Ark.*, 958 F.2d 207, 211 n.2 (8th Cir. 1992) ("The test 'in an excessive force case is an objective one.' *Graham v. Connor*, 490 U.S. 386, 397, 109 S. Ct. 1865, 1872, 104 L. Ed. 2d 443 (1989). Thus, '[a]n officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional.' *Id*."); *see also Moore v. City of Desloge, Mo.*,647 F.3d 841, 848 (8th Cir. 2011) ("The relevant question is the objective (albeit fact-specific) question whether a reasonable officer could have believed the officer's warrantless search to be lawful, in light of clearly established law and the information the searching officers possessed.") (quotation, alterations, and citation omitted).

### III. *Conclusion*

Accordingly, we affirm the judgment of the district court.

_____