**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**May 30, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

LIBERTY SAVINGS BANK, FSB,

Plaintiff - Appellant,

v.

GENERAL ELECTRIC CAPITAL
CORPORATION,

Defendant - Appellee.

------------------------------------

LIBERTY SAVINGS BANK, FSB,

Plaintiff - Appellee,

v.

GENERAL ELECTRIC CAPITAL
CORPORATION,

Defendant - Appellant.

No. 06-1091

(D. Colorado)

(03-cv-02218-REB-CBS)

No. 06-1428

(D. Colorado)

(03-cv-02218-REB-CBS)

**ORDER AND JUDGMENT**[*]

Before **LUCERO**, **ANDERSON**, and **McCONNELL**, Circuit Judges.

---

[*]This order and judgment is not binding precedent except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

In these two cases which have been consolidated on appeal, plaintiff Liberty Savings Bank ("Liberty") appeals the award of summary judgment in favor of defendant GE Capital Corporation ("GE") (Appeal No. 06-1091), and defendant GE appeals the denial of its motion for sanctions under Fed. R. Civ. P. 11 (Appeal No. 06-1428). We affirm both appeals.

## BACKGROUND

Webb Crane Service, Inc. ("Webb") was a closely held corporation engaged in the business of renting and selling cranes, trucks and heavy equipment in Denver and the intermountain west. William Webb, Kelly Webb and Leslie Webb (collectively "the Webbs") were its shareholders, directors and officers.

Liberty is a federally chartered savings and loan which, from March 1997 through the spring of 2003, supplied Webb with a revolving and renewable line of credit secured by real estate liens, personal guarantees of the Webbs, accounts receivable and inventory. Webb promised that the proceeds from the line of credit would only be used for the operations of Webb's crane business. Webb maintained a general operating account at the Bank of Colorado, into which it deposited money provided to it by Liberty pursuant to the line of credit, as well as money from various other sources, including from its rentals and sales of cranes and from other creditors.

Beginning in 1998, GE supplied Webb with equipment financing for the purchase of cranes which Webb rented and sold to customers. As security for the financing GE provided, GE and Webb entered into a Dealer Floor Financing and Security Agreement ("Security Agreement"). The Security Agreement provided that GE had a security interest in the "Collateral," which was, in turn, defined as "[a]ll inventory which is financed by Lender [GE]." Security Agreement at ¶ 2(a), App. at 381, Vol. 2 tab 14.

In 1996, the Webbs, along with Dennis Williams, formed an entity called KLWW.[1] KLWW was created for the purpose of purchasing a forty-acre piece of property known as the Gypsum Property, a portion of which was to be used as a new facility for Webb's planned expansion into western Colorado, with the rest to be developed and sold in parcels. The development was called the Spring Creek Industrial Park ("SCIP"). KLWW purchased the Gypsum Property in 1996 from John Forier for $1,000,000.[2] Forier provided purchase money financing for $800,000 of the purchase price.

Beginning in 1997, Webb began making transfers of funds to KLWW for the purpose of funding and developing the Gypsum Property. These transfers are at the heart of this case, as Liberty claims they were fraudulent and in violation of

---

[1] The Webbs and Dennis Williams were originally named as defendants, along with Webb, in this action. They were dismissed from this action, and are not involved in this appeal.

[2] Forier was also originally a defendant in this case.

the terms under which Liberty loaned money to Webb. The parties dispute when Liberty became aware of these transfers. Liberty argues it was unaware of them until spring of 2003, at which time it determined to commence this lawsuit. GE avers that Liberty became aware of them no later than May 2001.

Webb provided financial statements for the calendar years 2000 and 2001 to both Liberty and GE. GE alleges that in Webb's 2000 financial statement, Webb revealed for the first time that it held "long-term notes receivable" from "related parties" for over 1.1 million dollars and "accounts receivable" from "related parties" for over 1.8 million dollars. Appellant's App. Vol. 2 at 506, 516.

After it reviewed these financial statements, GE asked Webb to fully disclose all transactions between Webb and KLWW. GE further avers that, after it received the requested information, it realized that part of the moneys Webb received from its crane rental business was being used to fund the purchase and development of property owned by KLWW, rather than being used by Webb directly. GE then asked for and received a corporate guarantee from KLWW to secure the debt owed by Webb to GE.

In May 2001, Charles David Turpie, Liberty's senior loan officer for the Webb account, met with representatives of Webb to discuss Webb's financial condition. Following that meeting, Turpie prepared a memorandum ("Turpie

-4-

Memorandum") describing what he learned from the Webb representatives. The

Turpie Memorandum contained the following statements:

> Webb has been struggling with cash flow due primarily to two reasons. First, the company has grown revenue significantly over the past five years [but] [p]rofitability has not kept pace. Secondly, costs associated with the purchase and development of a commercial site in Gypsum, Colorado have depleted cash reserves.
>
> . . .
>
> Additional concerns centered on our requirement to place deeds of trust on the company's properties in Denver, Grand Junction and Gypsum. The cost of appraisals and environmental assessments was a minor concern. This triggered more conversation about the Gypsum property.
>
> Forty acres, adjacent to the airport in Gypsum, were purchased in 1996 for $1,000,000. $800,000 of this amount was provide[d] through seller financing, while the balance came from Webb. Will [Webb] wanted to move a crane staging area from Edwards, Colorado to nearby Gypsum. Only five acres were needed for this purpose. In my opinion, it seems that there was no clear direction, until recently, on the disposition of the remaining 35 acres. . . . I am unclear on the exact details of the acquisition, but it was made through a LLC named KLW&W, LLC. . . .
>
> . . .
>
> The point of this information is that KLW&W . . . has spent . . . roughly an additional $300,000 for permitting and development costs at Gypsum. The plan is to sell, lease or even possibly develop, in partnership with others, subdivided lots on the 35 acres. This plan would obviously be hindered by placing a second deed of trust on the property.

Turpie Mem. at 1-2, Appellant's App. Vol. 2 at 490. Turpie sent this

memorandum to Liberty's credit department at Liberty's headquarters in Dayton,

Ohio. Thus, as the district court noted in its first order granting summary

judgment to GE on most of Liberty's claims, "[b]y May, 2001, Liberty was aware

-5-

that KLWW planned to develop the SCIP, and that Webb had invested at least 200 thousand dollars in the project." Order at 4-5, Appellant's App. Vol. 6 at 1267-68. Shortly after Turpie wrote his memorandum, Webb employee Kevin Williams sent a letter to Turpie, in which he further described the SCIP project and stated that "Webb Crane will need additional capital to continue the development of its facility on the property." 5/24/01 letter at 2, Appellant's App. Vol. 2 at 478.

In the middle of 2002, Webb began failing to make its required monthly payments to GE. GE sought information about Webb's financial situation in an effort to resolve Webb's apparent financial problems. By October of 2002, GE had obtained two evaluations of Webb's financial condition: an appraisal of the SCIP property by Cushman & Wakefield which indicated that Webb would need to spend an additional $580,000 to complete the development of the SCIP before lots could be sold; and a report by the Focus Group, which analyzed Webb's financial situation and described two options for Webb to pay its debt to GE. The Focus Group report also indicated that an additional "cash infusion of $0.75 million" would enable Webb to complete the development of the SCIP property. Appellant's App. Vol. 6 at 1219.

On November 1, 2002, GE and Webb entered into a restructuring agreement ("Restructuring Agreement"). The Restructuring Agreement required Webb to give to GE from fifty to seventy-five percent of the net profits from sales of the SCIP lots. The Agreement also gave GE a deed of trust on the SCIP property and

the right to some of the proceeds of any third-party investment in the SCIP property. Furthermore, the Agreement provided that GE would forgive Webb the payment of $200,000 in accrued default interest.

Meanwhile, Liberty remained involved in the machinations relating to the Gypsum/SCIP property. On September 20, 2002, Chris Christopherson, Webb's Chief Financial Officer at the time, went to Liberty's offices and requested that Liberty wire the sum of $188,392.75 on behalf of "KLWW (Webb Crane), Account #1044000201" directly to the Eagle County treasurer. Liberty did so, thereby paying the real estate taxes owing on the Gypsum property.

On October 23, 2002, Liberty renewed Webb's annual line of credit. In early 2003, Webb began failing to make its required payments to Liberty. In April 2003, Liberty filed its first complaint in this case in state court. On May 30, 2003, GE and Webb entered into a Voluntary Surrender Agreement, pursuant to which Webb voluntarily surrendered to GE the equipment financed by GE. On that same day, GE and other creditors filed involuntary bankruptcy petitions against both Webb and KLWW. The bankruptcy court entered an order for relief in the Webb bankruptcy on June 17, 2003, and an order for relief in the KLWW bankruptcy on July 30, 2003. The matter was then transferred to federal district court.

Liberty's nineteen-count complaint against Webb, GE and others alleged a host of claims relating to Webb's transfer of funds to KLWW for the SCIP

project.  Of the nineteen counts, ten were against GE and of those ten, eight are at issue in this appeal.[3]  No other defendants are involved in this appeal.  Four of the counts against GE alleged that GE aided and abetted Webb in a breach of fiduciary duty, fraudulent transfers, fraudulent misrepresentation and concealment.  One count charged GE with civil conspiracy.  One count alleged that GE interfered with the existing contractual relationship between Liberty and Webb.  One count charged that GE's security interest in its collateral was invalid and another count asserted that the proceeds of that collateral realized by GE should go to Liberty instead.  The gravamen of these counts is that GE secretly assisted and/or enabled Webb in its diversion of funds it received from Liberty to KLWW for the SCIP project, in violation of the terms of the loan agreement between Liberty and Webb, thereby insuring that GE's loan to Webb was protected and repaid, at least in part, to the detriment of Liberty and its loan to Webb.

## DISCUSSION

### I.  Appeal No. 06-1091

We do not belabor the procedural details, which are not germane to this appeal, but merely note that the district court ultimately granted summary judgment in favor of GE on all of Liberty's claims.  Accordingly, the usual

---

[3]Liberty has not appealed the judgment in favor of GE on two of the counts.

summary judgment standard of review applies, requiring us to review the district court's grant of summary judgment de novo, applying the same standard as did the district court. Summum v. Duchesne City, 482 F.3d 1263, 1268 (10th Cir. 2007). "Summary judgment is proper only if the record shows 'that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" Id. (quoting Fed. R. Civ. P. 56(c)).

Liberty does not argue that there are genuine issues as to any material facts; rather, Liberty disagrees with the legal conclusions drawn from the essentially undisputed facts of this case. In any event, the district court viewed the facts in the light most favorable to Liberty, as required by the summary judgment standards. The district court's order was thorough and well-reasoned. We see no need to elaborate upon it. Accordingly, we affirm the district court's grant of summary judgment in favor of GE, for substantially the reasons set forth in the district court's opinion.

## II. Appeal No. 06-1428

The district court ruled in favor of GE in two orders granting summary judgment. The first order, granting summary judgment in favor of GE on nine of ten claims against it, was filed on July 27, 2005. The second order, granting summary judgment in favor of GE on the one remaining claim of civil conspiracy,

was filed on February 9, 2006. In between these two orders, on September 21, 2005, GE filed a motion for sanctions under Fed. R. Civ. P. 11.

Rule 11 provides in pertinent part as follows:

**(1) How Initiated.**
　　**(A) By Motion.** A motion for sanctions under this rule shall be made separately from other motions or requests and shall describe the specific conduct alleged to violate subdivision (b). It shall be served as provided in Rule 5, but shall not be filed with or presented to the court unless, within 21 days after service of the motion (or such other period as the court may prescribe), the challenged paper, claim, defense, contention, allegation, or denial is not withdrawn or appropriately corrected. If warranted, the court may award to the party prevailing on the motion the reasonable expenses and attorney's fees incurred in presenting or opposing the motion.

Fed. R. Civ. P. 11(c)(1). "'[S]ervice of a sanctions motion after the district court has dismissed the claim or entered judgment prevents giving effect to the safe harbor provision or the policies and procedural protections it provides, and it will be rejected.'" Roth v. Green, 466 F.3d 1179, 1193 (10th Cir. 2006) (quoting 5A Charles Alan Wright and Arthur R. Miller, Federal Practice and Procedure § 1337.2, at 727 (3d ed. 2004)), petition for cert. filed, 2007 WL 1379720 (06-1490) (U.S. May 9, 2007). While GE's motion was filed after the first grant of summary judgment, because the one claim remained, it appears that GE technically complied with this procedural rule.

"'[A]n appellate court should apply an abuse-of-discretion standard in reviewing all aspects of a district court's Rule 11 determination.'" Findlay v.

Banks (In re Cascade Energy & Metals Corp.), 87 F.3d 1146, 1149 (10th Cir. 1996) (quoting Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 405 (1990)). "A court abuses its discretion when its decision is 'arbitrary, capricious, or whimsical, or results in a manifestly unreasonable judgment.'" United States v. Sinks, 473 F.3d 1315, 1319 (10th Cir. 2007) (quoting United States v. Weidner, 437 F.3d 1023, 1041 (10th Cir. 2006)).

In its motion for sanctions, GE identified the offending material as follows:

> The falseness and frivolousness of the pleadings, motions, and actions of Liberty and/or its counsel is established by the record in this matter, the entirety of which is incorporated herein, including, specifically, those pleadings and motions referenced in and that conduct discussed in the following:
>
> (1) GE Capital's Response and Sur-Reply to Liberty's Crime-Fraud Motion;
>
> (2) GE Capital's Original Motion for Summary Judgment and Reply Brief in Support thereof;
>
> (3) GE Capital's Response to Liberty's Motion for Summary Judgment; and
>
> (4) GE Capital's Supplemental Motion for Summary Judgment on Liberty's Sole Remaining Claim Against It.

Motion at 4, Appellant's Op. Br. App., tab 1. GE made no more specific references to particular pleadings, motions or other materials which it claimed were filed or presented in violation of Rule 11.

In its order denying GE's Rule 11 motion, the district court stated:

-11-

In support of its general claims, GE incorporates nondescriptly the entire record by reference and six papers GE filed in the course of the litigation, . . . No further circumstantiation is offered. Such general references do not approach the quantum of proof necessary to sustain GE's burden of persuasion. I have neither the time nor the inclination to do GE's work by parsing punctiliously through each individual claim for relief and each of the papers cited generally by GE to determine if the exacting standards of Rule 11 have been satisfied in the context of GE's conclusory assertions. As the Seventh Circuit noted aptly, "[j]udges are not like pigs, hunting for truffles buried in the briefs." United States v. Dunkel, 927 F.2d 955, 956 (7th Cir. 1991).

Order at 2, Appellant's Op. Br. App., tab 4. The court further observed:

Disturbingly, in identifying these six papers, GE does not provide their precise titles, their docket numbers within the court's CM/ECF database, or their filing dates. Equally disturbing is the fact that GE has ignored my practice standard requiring "specific references in the form of pinpoint citations." Both procedural deficiencies adversely affect my ability to ascertain the validity of GE's claims.

Id. at n.1 (quoting REB Civ. Practice Standard II.D.2).

On appeal, GE argues strenuously that it did, in fact, cite specific examples

of Liberty's misconduct:

[A]s established by the [Liberty financial expert] Aucone testimony, the Turpie Memorandum, the May 24, 2001 Letter, and the Wire Transfer Form, coupled with GE's reference to, citation to, and quotations of these documents in its filings with the District Court, the District Court's complaints are not well founded.

Appellant's Op. Br. at 20. However, the only specific references to these

documents occur in GE's reply brief, responding to Liberty's objection to the

motion for sanctions. "[G]enerally we do not consider arguments raised for the

first time in reply briefs." <u>United States v. Gurule</u>, 461 F.3d 1238, 1248 (10th Cir. 2006). Similarly, the district court was entitled to judge the adequacy of GE's support for its sanctions motion without reference to the more specific citations supplied belatedly in GE's reply brief.

In any event, even considering all of GE's allegations, we cannot say that the district court abused its discretion in concluding that Liberty's conduct did not warrant sanctions. Its decision was not arbitrary, capricious, whimsical or manifestly unreasonable.

## CONCLUSION

For the foregoing reasons, we AFFIRM both of these appeals.

ENTERED FOR THE COURT


Stephen H. Anderson
Circuit Judge