# United States Court of Appeals

## For the Eighth Circuit

_____

No. 12-1806

_____

American Bank of St. Paul

*Plaintiff - Appellee*

v.

TD Bank, N.A.

*Defendant - Appellant*

_____

No. 12-1862

_____

American Bank of St. Paul

*Plaintiff - Appellant*

v.

TD Bank, N.A.

*Defendant - Appellee*

_____

No. 12-2399

_____

American Bank of St. Paul

*Plaintiff - Appellee*

v.

TD Bank, N.A.

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of Minnesota - Minneapolis

_____

Submitted: February 12, 2013
Filed: April 26, 2013

_____

Before SMITH, MELLOY, and BENTON, Circuit Judges.

_____

BENTON, Circuit Judge.

Mercantile Bank lent money to Louis J. Pearlman, who was perpetrating a large fraud. Before the fraud was exposed, American Bank of St. Paul and 25 other banks lent him money. Part of those funds paid off Mercantile's outstanding loans to Pearlman. American sued Mercantile, claiming it aided, abetted, and conspired with Pearlman. The jury found for American, awarding one-half of the requested damages. Mercantile claims that the district court[1] made erroneous evidentiary rulings, gave faulty jury instructions, and should have dismissed the claims as a matter of law. American cross-appeals, claiming that the court should have increased the award to the full amount of the loss. Having jurisdiction under 28 U.S.C. § 1291, this court affirms.

_____

[1]The Honorable Ann D. Montgomery, United States District Judge for the District of Minnesota.

-2-

I.

Pearlman was a music producer, real-estate developer, and businessman in Florida. He had a banking relationship with Mercantile.[2] In April 2003 – when Mercantile had about $10 million in loans outstanding to Pearlman – it agreed to lend him an additional $6 million. The new loan was collateralized by stock Pearlman held in Transcontinental Airlines, Inc. (TCA), a private charter airline company. TCA was supposedly audited by Cohen & Siegel, purportedly a German auditing firm with an office in Coral Gables, Florida.

Pearlman borrowed yet another $6 million from Mercantile on a line of credit in February 2004. In early 2005, Pearlman sought to consolidate all his outstanding debts to Mercantile (about $14 million) into one loan. During Mercantile's due diligence and underwriting process, it twice extended Pearlman's line of credit, and then added an additional $3 million credit line.

A new credit analyst at Mercantile evaluated Pearlman's loans. Through her own research, she could not confirm the existence of Cohen & Siegel. Mercantile hired an investigative firm, which also could not confirm the accounting firm. Mercantile then met with attorneys to develop a plan to collect Pearlman's debt, which was now in default.

Mercantile and Pearlman met three times to discuss the situation. At one meeting, Mercantile's president, Andy Cheney, met one-on-one with Pearlman. Cheney claims that in this conversation he stressed to Pearlman only the importance of being truthful. Pearlman, however, contends he told Cheney that TCA was a "can

_____

[2]After the events in this case, TD Bank, N.A. purchased Mercantile Bank. Although TD Bank is the defendant here, this court will refer to the defendant as "Mercantile."

of worms" that no one wanted to open, and that it could get "very messy." At trial, over objection, Pearlman was allowed to testify that Cheney understood that TCA was a "house of cards." After this meeting, Mercantile and Pearlman entered into a forbearance agreement giving Pearlman time to repay the loans.

In Fall 2005, Pearlman worked with North American Capital Markets (NACM) to assemble a new financing facility. According to the offering materials, the facility's purpose was to pay off existing debt (including Mercantile's), and finance Pearlman's purchase and production of the "Top of the Pops" television program from the BBC. Several small, local banks – with American as the lead – participated in the financing. The participation agreement stated that each bank performed its own due diligence and made its own investment decision.

In March 2006, Pearlman said he needed $5 million from the new facility to make a licensing payment for the television program. The facility was not yet fully participated, so it could not close. NACM presented two options to Mercantile: (1) close the facility and receive partial payoff of the debt, with Mercantile taking a participation interest in the new facility for the amount left outstanding; or (2) NACM would provide the additional funds necessary to close the transaction, but once the facility was fully participated, NACM would be paid off before Mercantile. Mercantile chose the first option. It participated in the new facility for $1.89 million. Mercantile's participation was paid off in April 2006.

Pearlman subsequently pled guilty to several charges of bank frauds and Ponzi schemes. He defaulted on the new facility in December 2006. He admitted that TCA and Cohen & Siegel were fabricated.

American sued Mercantile on six grounds attempting to recover the unpaid balance on the facility. The district court granted summary judgment to Mercantile on four theories, but allowed a trial on aiding and abetting as well as conspiracy. The

-4-

court denied Mercantile's Rule 50 motion for judgment as a matter of law. The jury found for American on both theories. Using a special verdict form, the jury awarded American $13,557,900.50, one-half of the amount outstanding when Pearlman defaulted. Mercantile timely renewed its motion for judgment as a matter of law and sought, in the alternative, a new trial. The district court denied both motions.

## II.

Mercantile argues that the district court should have granted its motion for judgment as a matter of law. Under Rule 50, a court may grant the motion if "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." **Fed. R. Civ. P. 50(a)(1)**. This court reviews de novo a denial, viewing the evidence most favorable to the jury's verdict. *Wilson v. Brinker Int'l, Inc.*, 382 F.3d 765, 769 (8th Cir. 2004). This court will reverse only if "there is a complete absence of probative facts to support the verdict." *Sanders v. Lee Cnty. Sch. Dist. No. 1*, 669 F.3d 888, 894 (8th Cir. 2012), *quoting Wilson*, 382 F.3d at 769. "Judgment as a matter of law is appropriate only when the record contains 'no proof beyond speculation to support the verdict.'" *Wilson*, 382 F.3d at 770, *quoting Phillips v. Collings*, 256 F.3d 843, 847 (8th Cir. 2001).

Mercantile contends that judgment as a matter of law was appropriate on the aiding and abetting claim as well as the conspiracy claim.

## A.

An aiding and abetting claim in Minnesota has three elements:

(1) the primary tort-feasor must commit a tort that causes an injury to the plaintiff;

(2) the defendant must know that the primary tort-feasor's conduct constitutes a breach of duty; and

(3) the defendant must substantially assist or encourage the primary tort-feasor in the achievement of the breach.

*Witzman v. Lehrman, Lehrman & Flom*, 601 N.W.2d 179, 187 (Minn. 1999). Mercantile contends the third element was not met because Mercantile did not provide substantial assistance to Pearlman. Some affirmative step is required, because "the mere presence of the particular defendant at the commission of the wrong, or his failure to object to it, is not enough to charge him with responsibility." *Id.* at 189, *quoting **Olson v. Ische**, 343 N.W.2d 284, 289 (Minn. 1984).

Mercantile offers Minnesota's general rule that banks have no duty to disclose financial information about customers absent special circumstances. *See **Klein v. First Edina Nat'l Bank***, 196 N.W.2d 619, 622-23 (Minn. 1972). The court gave three examples of special circumstances:

(a) One who speaks must say enough to prevent his words from misleading the other party. *Newell v. Randall*, 19 N.W. 972 (Minn. 1884).

(b) One who has special knowledge of material facts to which the other party does not have access may have a duty to disclose these facts to the other party. *Marsh v. Webber*, 13 Minn. 109, Gil. 99 (1868).

(c) One who stands in a confidential or fiduciary relation to the other party to a transaction must disclose material facts. *See, e.g.*, *Wells-Dickey Trust Co. v. Lien*, 204 N.W. 950 (Minn. 1925).

*Id.* at 622. Minnesota courts also recognize a specific exception when the bank is aware that the client is "irretrievably insolvent." ***Richfield Bank & Trust Co. v. Sjogren***, 244 N.W.2d 648, 651 (Minn. 1976). Mercantile cites *Boubelik v. Liberty State Bank*, 553 N.W.2d 393 (Minn. 1996), to argue that even when a bank is aware of a "scheme," it is not required to disclose information about its client to another party. That was true in *Boubelik*, but only because the material facts of the scheme were publically available. ***Boubelik***, 553 N.W.2d at 400. The *Boubelik* court simply applied the second exception from *Klein*. The parties disagree about the amount of information available to American in this case. All of the parties' discussion about the no-duty rule, however, misses the mark regarding the allegations of aiding and abetting. Liability is based on Mercantile's affirmative acts, not acts it should have taken.[3]

Mercantile contends it did nothing more than enter into normal banking transactions with a customer, emphasizing it did not draft the offering materials or solicit the participating banks. It was a mere forbearance of debt collection, so the argument goes, and the participation rolled old debt into new debt – no additional capital was provided. A decision from the Second Circuit closely parallels this case. *See **In re Sharp Int'l Corp.***, 403 F.3d 43 (2d Cir. 2005). There, three brothers, the Spitzes, owned Sharp International. *Id.* at 46. They perpetrated a fraud through that business. *Id.* State Street was one of Sharp's lenders. *Id.* at 47. The Spitzes borrowed money from new noteholders to pay off State Street (when State Street allegedly knew of the fraud). *Id.* at 47-48. The noteholders sued State Street. *Id.* at 48.

---

[3]The district court accordingly instructed the jury to "not consider for any purpose whether Mercantile Bank should have disclosed any information it may have had about Louis Pearlman to American Bank or the Participant Banks."

The court observed that under New York law there is no duty to warn (similar to Minnesota), and there must be affirmative assistance. *Id.* at 50-51. The plaintiff alleged five grounds for affirmative assistance. *Id.* at 51-52. The court dismissed four in short order, finding they were nothing more than forebarance (e.g., failure to report or reveal). *Id.* The fifth ground more closely parallels this case. The original loan agreements required State Street to consent before the new noteholders purchased additional notes. *Id.* at 52. Finding this consent was not substantial assistance, the court said:

> State Street's grant of consent can be characterized as affirmative: State Street was called upon to utter or write a consent without which Sharp could not have borrowed additional funds from the Noteholders. On the other hand, State Street's consent was mere forbearance; it did no more than remove a contractual impediment that was reserved to State Street to invoke or not in its own interest. The existence of that right did not entail a duty to consider the interests of anyone else, and State Street's exercise of that right to protect itself rather than its improvident competitors did not constitute participation in the Spitzes' fraud.

*Id.* at 52.

Mercantile likens its participation to State Street's consent – removing an obstacle to the completion of the transaction. The district court correctly found that Mercantile's participation was sufficient to send the question to the jury. Participation is more than consent. It is more than pressuring a client to find additional sources of financing. *See, e.g.*, **Liberty Sav. Bank, FSB v. Webb Crane Serv., Inc.**, 2005 WL 1799300, at *5 (D. Colo. July 27, 2005) (unpublished), *aff'd sub nom.* **Liberty Sav. Bank, FSB v. Gen. Elec. Capital Corp.**, 236 Fed. Appx. 353, 357 (10th Cir. 2007). Here, Mercantile's participation allowed the facility to close, allowed Mercantile to immediately recoup about $10 million of its investment, and gave Mercantile a continuing interest in the new debt. Whether that, among all the facts here, constitutes aiding and abetting is a question for the jury. Because of this

-8-

court's deference to the verdict, Mercantile invites this court to rule that, as a matter of law, this type of participation is not substantial assistance. This court declines.[4]

Several witnesses testified that Mercantile's participation was necessary for the loan's closing. Pearlman testified that Mercantile "wanted to make a deal so badly that they participated in the next deal as a facade." Mercantile's credit officer – who approved the participation – acknowledged that it did not meet the bank's underwriting standards. Mercantile's expert testified that the loan presentation report from the participation "did not include all of the relevant facts that they had knowledge of." While Mercantile disputes the significance of this testimony, the jury was free to believe it.

The district court did not err by denying Mercantile's Rule 50 motion for judgment as a matter of law on the aiding and abetting claim.

B.

On the conspiracy claim, Mercantile contends that the district court should have granted its motion for judgment as a matter of law. Proof of a conspiracy

---

[4]American claims that *In re Sharp* is easily distinguishable, because it applies New York law. This distinction is weak. New York and Minnesota both follow the Second Restatement approach to aiding and abetting. *Witzman*, 601 N.W.2d at 187; *Kolbeck v. LIT Am., Inc.*, 939 F.Supp. 240, 247 (S.D.N.Y. 1996). American's main assertion is that in Minnesota, the knowledge and substantial-assistance elements of aiding and abetting are evaluated "in tandem." *Witzman*, 601 N.W.2d at 188. "Thus, 'where there is a minimal showing of substantial assistance, a greater showing of scienter is required.'" *Id.*, quoting *Camp v. Dema*, 948 F.2d 455, 459 (8th Cir. 1991). Regardless of the extent to which New York follows this approach, the tandem analysis in Minnesota demonstrates another reason why this case is best left to the jury. The jury is in the best position to weigh all of the evidence and make a conclusion.

requires a meeting of the minds between Pearlman and Mercantile to commit the fraud. *Bukowski v. Juranek*, 35 N.W.2d 427, 429 (Minn. 1948). A conspiracy must be based on more than speculation and conjuecture. *Mettler v. Whitledge*, 165 F.3d 1197, 1206 (8th Cir. 1999). "Mere knowledge of another's wrongdoing is insufficient to hold a party liable as a conspirator." *City of Omaha Emps. Betterment Ass'n v. City of Omaha*, 883 F.2d 650, 653 (8th Cir. 1989). Circumstantial evidence can be used to establish a conspiracy. *United States v. Bowie*, 618 F.3d 802, 812 (8th Cir. 2010).

Mercantile asserts that the only possible evidence of a meeting of the minds was the one-on-one conversation between Pearlman and Cheney. Because Mercantile believes testimony about that conversation was inadmissible, it contends that it should have received judgment as a matter of law.

This court reviews evidentiary rulings for clear abuse of discretion, and reverses "only when an improper evidentiary ruling affected the defendant's substantial rights or had more than a slight influence on the verdict." *Chism v. CNH Am. LLC*, 638 F.3d 637, 640 (8th Cir. 2011), *quoting United States v. Summage*, 575 F.3d 864, 877 (8th Cir. 2009). Over American's objection, the district court allowed parts of Pearlman's videotaped deposition to be played for the jury. Specifically, Pearlman testified that Cheney "understood" what he meant by "things would get very messy" if Mercantile continued to push about TCA and Cohen & Siegel.

Mercantile argues that this testimony is unhelpful and prejudicial because Pearlman did not know Cheney's thoughts. Testimony must be based on a witness's personal knowledge. **Fed. R. Evid. 602**. Opinion testimony of a lay witness must be "rationally based on the witness's perception" and "helpful to clearly understanding the witness's testimony or to determining a fact in issue." **Fed. R. Evid. 701(a), (b)**; *In re Air Crash at Little Rock Ark., on June 1, 1999*, 291 F.3d 503, 515 (8th Cir. 2002) ("Rule 701 requires that lay witness opinion testimony need only be rationally

based on perception and helpful to a determination of a fact in issue."). "Personal knowledge or perceptions based on experience is a sufficient foundation for such testimony." *In re Air Crash*, 291 F.3d at 515, *citing **Wactor v. Spartan Transp. Corp.***, 27 F.3d 347, 350 (8th Cir. 1994).

Pearlman's testimony was rationally based on his perception of the conversation and the circumstances. He indicated that the bank was taking a more aggressive posture toward the relationship before the conversation. Afterwards, Mercantile was willing to enter a forbearance agreement. Pearlman's testimony was based on his banking relationship with Cheney and Mercantile. Pearlman had both personal knowledge and experience with this relationship – a proper basis for the testimony. **United States v. Rea**, 958 F.2d 1206, 1216 (2d Cir. 1992) ("There are a number of objective factual bases from which it is possible to infer with some confidence that a person knows a given fact. These include what the person was told directly, what he was in a position to see or hear, what statements he himself made to others, conduct in which he engaged, and what his background and experience were."). Further, problems with this testimony could be exposed through cross-examination or impeachment evidence (including Pearlman's fraud convictions).

The testimony is also helpful to the jury because it provides context to the conversation and information about the parties' relationship. The testimony in this case is different than the testimony excluded in the cases Mercantile cites. *See **Hester v. BIC Corp.***, 225 F.3d 178, 181-86 (2d Cir. 2000) (excluding – under precedent specific to employment discrimination cases – testimony of witnesses that an employer's actions were racially motivated, because it expressed opinion only as to the ultimate charge and not to facts supporting the charge) **United States v. Cortez**, 935 F.2d 135, 139 (8th Cir. 1991) (excluding officers' testimony that a witness was being "truthful" because it lacked foundation; this was the officers' first interaction with the witness); **Hirst v. Inverness Hotel Corp.**, 544 F.3d 221, 227 (3d Cir. 2008) (excluding a witness's testimony of causation because it was the ultimate issue and

the witness had never visited the site personally and had no helpful first-hand knowledge); *United States v. Henke*, 222 F.3d 633, 639-42 (9th Cir. 2000) (excluding testimony from a board member that the defendants "must have known" about a fraudulent scheme based on the board's evaluation of the relevant evidence – not based on any personal interaction or conversation with the defendants); *Rea*, 958 F.2d at 1219-21 (error to allow a witness to testify that the defendant "had to know" about an illegal scheme, although error was harmless because there was sufficient admissible evidence); *State v. Hines*, 133 N.W.2d 371, 376 (Minn. 1964) (witness's testimony that his impression was that the defendant "knew what was going on" was improperly admitted because it was pure conjecture, although error was harmless because sufficient admissible evidence established the same).

The testimony here is both rationally based on Pearlman's perception and helpful to the jury. *See United States v. Stadtmauer*, 620 F.3d 238, 262-65 (3d Cir. 2010) (holding that testimony from one accountant that another accountant "'knew' there were 'problems' with the tax returns" was both rationally based on perception and helpful to the jury, and thus admissible under Rule 701).

Much of Mercantile's belief of insufficient evidence is based on its misconception of the purpose for which this testimony is offered. The testimony helped also to establish knowledge – that Mercantile was aware of Pearlman's fraud.[5] Contrary to Mercantile's assertion, the conversation between Pearlman and Cheney is not the only evidence of an agreement between the parties. American offered additional circumstantial evidence to establish the conspiracy. *See Bowie*, 618 F.3d at 812. Most prominently, Mercantile participated in the loan. Additionally, there

---

[5]On appeal, Mercantile concedes that sufficient evidence existed for a reasonable jury to find it had actual knowledge of Pearlman's fraud. Because American argues that Pearlman's testimony is relevant only to knowledge, and not to a meeting of the minds, Mercantile says that the conspiracy charge must fail. But, as explained below, sufficient additional proof of a conspiracy existed.

was evidence that Mercantile employees were concerned with Pearlman's account and questioned his dealings. Mercantile and Pearlman also signed a forbearance agreement. While each of these does not separately establish a conspiracy, the totality of the evidence is sufficient for a reasonable jury to conclude that a conspiracy existed.

The additional evidence of a conspiracy also renders harmless any error in admitting Pearlman's statement that Cheney understood him. A verdict will not be reversed absent a showing that the ruling in question "had a substantial influence on the jury's verdict." **McPheeters v. Black & Veatch Corp.**, 427 F.3d 1095, 1101 (8th Cir. 2005), *citing* **Nichols v. Am. Nat'l Ins. Co.**, 154 F.3d 875, 889 (8th Cir. 1998). "[A] jury's verdict will not be disturbed absent a showing that the evidence was so prejudicial as to require a new trial which would be likely to produce a different result." **Safety Nat'l Cas. Corp. v. Austin Resolutions, Inc.**, 639 F.3d 498, 503 (8th Cir. 2011), *quoting* **Paul v. Farmland Indus., Inc.**, 37 F.3d 1274, 1277 (8th Cir. 1994). Even without Pearlman's testimony that Cheney understood what he meant, it is not likely that the jury would have reached a different result. There is ample independent evidence in the record to support a conspiracy. Therefore, even if the district court did err by admitting Pearlman's testimony, that error was harmless.

Any error is also harmless because similar testimony was not objected to by Mercantile. Pearlman testified "I understood and he understood," referring to Cheney. Mercantile asserts it is not possible to tell what Cheney understood. The full colloquy establishes otherwise:

Q. Who did you tell that to?
A. Andy Cheney.
Q. And did you tell him that demand to have Trans Continental Airlines write the check open a can of worms as you put it?
A. Yeah.
Q. Did you explain to him why that would be a can of worms?

-13-

A. He didn't want to know, which means he probably knew.

Q. When you say he didn't want to know, did he – how did he express that to you?

A. He didn't ask me any further questions on it.

Q. When you said having Trans Continental Airlines pay would open a can of worms?

A. We had a one on one. I understood and he understood.

This testimony has the same import as the objected-to testimony. Because similar evidence came in without objection, the objected-to testimony did not have a "substantial influence on the jury's verdict." *McPheeters*, 427 F.3d at 1101.

The district court did not err by denying Mercantile's Rule 50 motion for judgment as a matter of law on the conspiracy claim.

III.

Mercantile asserts that the district court erred by excluding evidence of the other participating banks' reactions to Pearlman's fraud. Mercantile believes this evidence is relevant as it would allow the jury to compare Mercantile's reaction to those of the other participating banks, and would demonstrate that Mercantile's reaction was reasonable. The district court excluded the evidence, ruling that relevant evidence demonstrated the knowledge and actions of Mercantile at the time it became aware of the fraud. The later-discovered evidence and reactions, the court ruled, were irrelevant and would tend to confuse the jury.

"A district court's exclusion of evidence is reviewed for an abuse of discretion." *Harris v. Chand*, 506 F.3d 1135, 1140 (8th Cir. 2007). The district court enjoys broad discretion in determining relevancy of evidence. *United States v. Watson*, 650 F.3d 1084, 1089 (8th Cir. 2011). Additionally, the court enjoys broad

deference on its weighing of probative value versus the risk of unfair prejudice. *United States v. Henderson*, 416 F.3d 686, 693 (8th Cir. 2005).

"Irrelevant evidence is not admissible." **Fed. R. Evid. 402**. The court correctly stated that the proper scope of this case was Mercantile's response to learning of the fraud. Evidence of other banks' responses to the same information is irrelevant. The evidence was properly focused on the allegations in the complaint.

Further, the district court noted that it did not "intend to try more than one fraud claim here," aptly describing the potential for confusion. "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." **Fed. R. Evid. 403**. Although the court did not specifically cite Rule 403, the record reflects that inquiry was present. *See Bair v. Callahan*, 664 F.3d 1225, 1229-30 (8th Cir. 2012) (Rule 403 inquiry present even though the rule was not specifically referenced), *citing Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.*, 254 F.3d 706, 716 & n.1 (8th Cir. 2001). The participants discovered the fraud through various methods, in varying degrees, and took varied approaches in response. This evidence could easily confuse the issues and mislead the jury.

Excluding other banks' reactions to Pearlman's fraud was not error.

IV.

Mercantile attacks the aiding and abetting jury instructions and requests a new trial.

-15-

This court reviews for an abuse of discretion a district court's jury instructions. *Zebley v. Heartland Indus. of Dawson, Inc.*, 625 F.3d 449, 455 (8th Cir. 2010). "A district court possesses broad discretion in instructing the jury, and jury instructions do not need to be technically perfect or even a model of clarity." *Id.* (quotation and citation omitted). We limit our review "to whether the jury instructions, taken as a whole, fairly and adequately represent the evidence and applicable law in light of the issues presented to the jury in a particular case." *Id.* (quotation and citation omitted). "[E]ven if we find that a district court erroneously instructed the jury, we will reverse only where the error affects the substantial rights of the parties." *Id.* (quotation and citation omitted).

**Der v. Connolly**, 666 F.3d 1120, 1126 (8th Cir. 2012).

The first challenged instruction concerns "actual knowledge." The district court instructed the jury that they must find that Mercantile "actually knew Louis Pearlman was committing fraud against American Bank . . . ." Mercantile wanted an instruction that "red flags and mere suspicions are not enough," and that what Mercantile "arguably should have known" was irrelevant. The court's instruction accurately stated the law in a clear fashion. The proposed instruction introduces additional confusion into words of common understanding. The court does not need to define terms of ordinary meaning. **United States v. Shyres**, 898 F.2d 647, 654 (8th Cir. 1990), *citing* **United States v. Smith**, 635 F.2d 716, 720 (8th Cir. 1980). The district court did not abuse its discretion.

Second, the district court denied an instruction Mercantile proposed. This court reviews for abuse of discretion. **Shaw Hofstra & Assocs. v. Ladco Dev., Inc.**, 673 F.3d 819, 828 (8th Cir. 2012). Mercantile's proposed instruction reads:

Substantial assistance means something more than routine business services to a bank customer. Thus, the routine extension of a loan does not amount to substantial assistance.

-16-

The district court did not abuse its discretion by denying this instruction. The instruction assumes the very question to be decided by the jury – whether Mercantile's actions were "routine." This proposal could also confuse the jury on a myriad of additional issues (e.g., what are "routine business services," what is a "routine extension," is participation considered "routine"). The district court properly denied this instruction and left the correct determinations to the jury.

V.

In its cross-appeal, American contends that the district court improperly denied its motion to increase the judgment to the full amount of its loss. Through the use of a special verdict form, the jury awarded American exactly one-half of its requested damages. American moved under Rule 59(e) for additur – to increase the amount of the judgment. The district court denied the motion.

Mercantile argues that American waived this argument because it did not present it in a Rule 50 motion for judgment as a matter of law. According to Mercantile, American never argued that the issue of damages should be taken away from the jury, which would require a judgment as a matter of law. American's theory, however, is that the jury instructions were proper but were misapplied by the jury and the court, resulting in an incorrect judgment. As they seek to amend that judgment, a Rule 59 motion is the appropriate vehicle. **Fed. R. Civ. P. 59(e)**.

This court reviews "the denial of an additur for abuse of discretion, bearing in mind that if the amount of damages was disputed, a grant of additur violates the losing party's Seventh Amendment right to a jury trial." ***Trinity Prods., Inc. v. Burgess Steel, L.L.C.***, 486 F.3d 325, 335 (8th Cir. 2007), *citing **Novak v. Gramm***,

469 F.2d 430, 432 (8th Cir. 1972).[6] American contends, however, that the amount of damages was not disputed, thus additur should be permitted. *See* **11 Charles Alan Wright et al.,** *Federal Practice and Procedure* **§ 2816 (3d ed. 1998)** ("A federal court may grant a new trial because of an inadequate verdict, but, unless the amount of damages is clear as a matter of law, it may not increase the damages above those awarded by a jury, either directly or by use of an additur." (footnotes omitted)).

Here, the district court correctly ruled that the amount of damages was a factual question for the jury. American correctly notes that the parties did not dispute the amount of the loan outstanding when Pearlman defaulted. Nevertheless, the amount of damages the banks suffered in reliance on Pearlman was a factual question for the jury.[7] American asserts that this is applying comparative fault, which is inappropriate for intentional torts. *Florenzano v. Olson*, 387 N.W.2d 168, 175 (Minn. 1986). Not so. The jury is tasked with determining the amount of damages attributable to the improper conduct, not with comparing that conduct to any other party's. This is made clear by the district court's Jury Instruction 29:

> . . . In deciding damages, decide the amount of money that will fairly
> and adequately compensate American Bank and/or each participating

---

[6]As the Supreme Court explained: "[W]here the verdict is too small, an increase by the court is a bald addition of something which in no sense can be said to be included in the verdict. When, therefore, the trial court here found that the damages awarded by the jury were so inadequate as to entitle plaintiff to a new trial, how can it be held, with any semblance of reason, that that court, with the consent of the defendant only, may, by assessing an additional amount of damages, bring the constitutional right of the plaintiff to a jury trial to an end in respect of a matter of fact which no jury has ever passed upon either explicitly or by implication?" ***Dimick v. Schiedt***, 293 U.S. 474, 486-87 (1935).

[7]Under the conspiracy theory, Mercantile is held liable for reliance on Pearlman's representations. ***Witzman***, 601 N.W.2d 185-86.

-18-

bank for the damages directly caused by relying on Louis Pearlman's misrepresentation.

. . . .

American did not object to this jury instruction. The plain language of this instruction charged the jury with determining the amount of damages caused by reliance. It further instructs the jury to do so "fairly" and "adequately." American essentially asks this court to ignore this instruction – an instruction to which it did not object. "If . . . the issue of damages was an issue of fact for the jury, as the parties and the court obviously thought it was when the case was submitted, the court was unquestionably without power to increase the judgment entered on the jury's verdict." ***Milprint, Inc. v. Donaldson Chocolate Co.***, 222 F.2d 898, 901 (8th Cir. 1955).

Additional jury instructions confirm the jury's discretion. The end of Instruction 29 states:

Damages for fraud or misrepresentation are limited to: *The difference between* the participation interest paid for and repayment actually received from Pearlman.

(emphasis in original). American did not object to this statement. Instead, it now criticizes the district court and Mercantile for "seiz[ing] on" the words *limited to*. Those words, however, are the correct focus. *Limited* is defined as "confined within limits: restricted in extent, number, or duration." ***Webster's Third New International Dictionary*** 1312 (1981). American argues that *limited to* limits only the "category" of damages that can be awarded, not the amount. American asserts that the language limits damages to "out-of-pocket" damages as opposed to "benefit-of-the-bargain" damages. Minnesota does prefer out-of-pocket damages in fraud and misrepresentation cases. ***B.F. Goodrich Co. v. Mesabi Tire Co.***, 430 N.W.2d 180, 182 (Minn. 1988). It does not follow from Minnesota's damages preference that

-19-

those full damages must be awarded in every case.  American correctly notes that Instruction 29 follows Minnesota's model instruction:

### Deciding damages for fraud and misrepresentation

In deciding damages, decide the amount of money that will fairly and adequately compensate (plaintiff) for the damages directly caused by relying on (defendant's) misrepresentation.

Damages for fraud or misrepresentation are limited to:

1 *The difference between* the actual value of the property received and the price paid for it, and

2 Any other damages that were directly caused by relying on the fraud or misrepresentation.

**4 Minnesota Practice, Jury Instruction Guides – Civil 57.25** (5th ed. 2010) (emphasis in original).  The plain text of the model instruction, and the instruction given here, indicates that the jury can award less that the full amount.  If the law required the full amount of the damages to be awarded, it would omit the words *limited to*.  The instruction would then read "Damages for fraud or misrepresentation are: *The difference between* the participation interest paid for and repayment actually received from Pearlman" – exactly what American wishes this court to hold.  This court refuses to read out *limited to*, especially in an instruction given without objection.

Question 11 of the special verdict form (included in full as the Appendix to this opinion) is also telling.  American did not object to the special verdict form.  The question states: "[W]hat amount of compensatory damages, if any, are each of the banks entitled to receive[?] . . . The maximum amount of damages allowable for each bank is identified in parentheses."  The jury identified the plaintiffs selected to recover – all of them – and wrote in the amount of damages for each particular bank.

Yet again, the plain language of the special verdict form confirms that the jury could award less than the full unpaid balance. Otherwise, the words "maximum" and "allowable" are unnecessary. American claims that the maximum amounts only provide an upper limit – that one bank could not receive *more* than its unpaid balance – but that the options for damages are either the full amount or zero. If this were true, there would be no reason for the jury to identify the amount of damages; the court would have simply asked the jury to identify the banks entitled to receive damages, then entered either judgment in full or zero damages.

American explains its failure to object by claiming that the instructions accurately stated the law, but the court failed to apply it correctly. The plain language of the instructions refutes American's argument. A reasonable jury could not read these instructions and conclude that the only possible outcomes for each participant bank were either full damages or zero damages. If American believed that to be the law, an objection was warranted.

Additur is not appropriate in this case because the question of damages was properly left to the jury. This is confirmed by several, unobjected-to, jury instructions and the form. The district court did not abuse its discretion by denying American's Rule 59(e) motion to amend the judgment.

Because damages were a jury issue, the court's prejudgment interest calculation was also correct. The damages were not "readily ascertainable" when Pearlman defaulted on December 1, 2009. *See **Matthew v. Unum Life Ins. Co. of Am.**, 639 F.3d 857, 864 (8th Cir. 2011).

* * * * * * *

The judgment of the district court is affirmed.

_____

# Appendix

If "yes," answer Question No. 10. If "no," proceed to Question No. 11.

**Question No. 10:** Were American Bank and the participant banks harmed as a direct result of that agreement, common understanding, or meeting of the minds?

Yes _X_   No _____

Proceed now to Question No. 11.

**Question No. 11:** If you answered "no" or "none" to any of Questions Nos. 1-5, do not answer this question, instead sign and date this verdict form. If you answered "no" to *either* Question No. 6 or Question No. 7 *and* answered "no" to *any* of Question Nos. 8-10, do not answer this question, instead sign and date this verdict form. Otherwise, what amount of compensatory damages, if any, are each of the banks entitled to receive. If a bank was not selected in *both* Question No. 3 and Question No. 4, do not award any damages to that bank. The total amount may not exceed $27,137,550. The maximum amount of damages allowable for each bank is identified in parentheses.

_X_ American Bank of St. Paul ($4,759,926) $2,379,963.00

_X_ Alerus Financial Corporation ($1,861,636) $930,818.00

_X_ American State Bank & Trust Company of Williston ($474,907) $237,435.50

_X_ Bank of Bozeman ($1,237,472) $618,736.00

_X_ Bank of Hazelton ($333,792) $166,896.00

_X_ Border State Bank ($952,528) $476,264.00

_X_ Border Trust Company ($952,528) $476,264.00

_X_ Crown Bank ($1,899,628) $949,814.00

_X_ Dakota Western Bank ($474,907) $237,453.50

_X_ Farmers & Merchants State Bank of Pierz ($238,810) $119,405.00

_X_ Farmers & Merchants State Bank of Tolna ($238,810) $119,405.00

_X_ First International Bank & Trust ($1,899,628) $949,814.00

_X_ First National Bank of Wadena ($523,755) $261,877.50

4

Appellate Case: 12-1806    Page: 28    Date Filed: 07/24/2012 Entry ID: 3935098

-22-

____X____ First Security Bank of Canby ($1,185,911) $592,955.50

____X____ First State Bank ($189,963) $94,981.50

____X____ First State Bank & Trust ($474,907) $237,453.50

____X____ Forreston State Bank ($1,715,093) $857,546.50

____X____ Frontier Bank ($952,528) $476,264.00

____X____ Integrity Bank Plus ($474,907) $237,453.50

____X____ Republic Bank ($3,799,257) $1,899,628.50

____X____ Ridgedale State Bank (n/k/a Highland Bank) ($284,944) $142,472.00

____X____ Security State Bank of North Dakota (n/k/a Bank Forward) ($952,528) $476,264.00

____X____ State Bank in Eden Valley ($189,963) $94,981.50

____X____ United Minnesota Bank ($238,810) $119,405.00

____X____ United Prairie Bank Springfield ($474,907) $237,453.50

____X____ Wadena State Bank ($333,792) $166,896.00

Dated: 01 DEC 2011

**SIGNATURE REDACTED**

5