# United States Court of Appeals
## For the Eighth Circuit
_____

No. 24-2689
_____

Angelica Woods

*Plaintiff - Appellee*

v.

City of St. Louis, Missouri, a municipal corporation; James Wilson, in his
individual capacity, also known as Jamie Wilson

*Defendants - Appellants*
_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis
_____

Submitted: November 18, 2025
Filed: March 30, 2026
_____

Before COLLOTON, Chief Judge, SHEPHERD and ERICKSON, Circuit Judges.
_____

ERICKSON, Circuit Judge.

After her termination, Angelica Woods commenced this action against the
City of St. Louis, Missouri, and the City's former Director of the Department of
Streets, James Wilson, asserting violations of the First Amendment to the United
States Constitution and the Family and Medical Leave Act ("FMLA"), 29 U.S.C.
§§ 2615 & 2617.  A jury returned a verdict in favor of Woods and against Wilson

on her First Amendment retaliation claim. Wilson appeals the district court's[1] denial of his renewed motion for judgment as a matter of law and his alternative motion for a new trial. We affirm.

## I.    BACKGROUND

Woods was employed by the City of St. Louis as a corrections officer for 22 years until she was injured on the job. In April 2020, Woods began working as a clerk typist for the City's Towing Service Division ("tow lot"). In this position, Woods dispatched tow trucks to various places around the city and inputted data into a computer system to document what services had been provided. Almost immediately, Woods developed concerns about the tow lot's operations. For instance, other tow lot employees told Woods that she could get cheap cars from the lot for herself and her family by changing the vehicle's sale price and obtaining a new title for the vehicle. Woods observed a non-tow lot employee retrieve vehicle keys and titles from the office. These vehicles were then sold without going through auction. Woods also observed tow lot employees, including Cheryl Pogue, Shonnell Stayton, and Kenya Lott, falsifying tow records by failing to record necessary information. Woods also heard Pogue call and inform people when nice vehicles with titles arrived so they could stop by and see if they wanted any of them. Additionally, Woods became aware of a scheme in which tow lot employees falsified bills of sale for cars bought at auction by changing the bid amount to a lower price. Some of these vehicles were then transferred to tow lot employees.

Edwin Young was Woods's initial supervisor. After Young was terminated, Steve Estopare became her supervisor. During the relevant period, Kent Flake oversaw the tow lot as the Commissioner of Streets and Wilson served as the Director of the Department of Streets. Woods reported her concerns about the tow

---

[1]The Honorable Catherine D. Perry, United States District Judge for the Eastern District of Missouri.

lot's operations[2] to Young, Flake, Wilson, the mayor's office, the City's comptroller's office, the City's personnel department, and eventually the media. After making these reports, tow lot employees labeled Woods a "snitch" and marginalized her because of her refusal to participate in the unlawful activities. Woods experienced harassment and retaliation by her co-workers and supervisors who were part of an informal "buddy system," which consisted of individuals who directly participated in the fraud and/or indirectly participated by protecting the participants and retaliating against those unwilling to participate.

Woods asked to meet with Wilson as early as November 2020 to discuss her concerns, but Wilson refused to meet with her. On December 17, 2020, Woods received an overall successful rating on her six-month evaluation. She received unsuccessful ratings in the categories of judgment; interpersonal skills; and work habits, and successful ratings in the areas of customer service; productivity; quality; and safety.

Due to internal conflict in the office, Woods submitted FMLA paperwork to take intermittent leave for work-related stress. The City approved Woods's request, but Woods claimed her supervisor denied her request to take an hour of leave on December 31, 2020, when a co-worker, Stayton, was harassing her. The conflict eventually led to a verbal altercation in the office, which was recorded by employee cell phones and surveillance video. The surveillance video, which Wilson played for the jury multiple times, depicted Woods and Stayton screaming at each other and calling each other names. Other employees stood by watching, only intervening to restrain one or the other from making physical contact. At one point, Stayton began removing her high heeled boot to fight Woods. Estopare eventually directed Woods to leave and docked Woods's pay. Although present for the entire incident, Estopare did not address Stayton's conduct at all, nor did he send her home.[3] When Woods

---

[2]Woods reported other issues as well, but the district court concluded in a pretrial ruling that only reporting the unlawful sale or transfer of vehicles was First Amendment protected activity and limited Woods's retaliation claim to this conduct.

[3]Stayton was later disciplined for her behavior but was not terminated.

challenged Estopare's handling of the situation, he called the police. Woods left and subsequently filed a grievance, resulting in her being paid for the day.

On January 20, 2021, Wilson notified Woods that he had scheduled a pre-termination review hearing for Wednesday, January 27, 2021. The hearing was subsequently rescheduled for Monday, February 1, 2021. Wilson identified three reasons the City was considering Woods's termination: (1) Woods illegally wiretapped or eavesdropped on a supervisor's meeting on November 17, 2020; (2) Woods falsely told a customer on November 24, 2020, that two tow lot employees stole a duffle bag out of the customer's vehicle when the bag had been seized by law enforcement; and (3) the verbal altercation with Stayton on December 31, 2020, violated harassment and workplace violence policies.

Woods retained an attorney to represent her. Her counsel sent Wilson a letter accusing the City of retaliating against Woods for reporting misconduct at the tow lot. Woods's counsel appeared and spoke at the pre-termination hearing, which was recorded. This was the only pre-termination hearing Wilson conducted during his tenure as director. At the hearing, counsel asserted that Woods was being unlawfully targeted in retaliation for reporting illegal activities at the tow lot to the comptroller's office, the mayor's office, and the personnel department. Counsel also disclosed Woods's participation in a KSDK news story.

Unbeknownst to Wilson, in early December 2020, Woods contacted KSDK and divulged information about employee misconduct at the tow lot. Woods spoke with reporters by phone and twice met with them in person in January 2021. On February 4, 2021, KSDK published an article and aired a story disclosing improprieties at the tow lot. The tow lot was described as a place where cars are towed and never seen again. The news story began with "confirmation" from the St. Louis Circuit Attorney's Office that an investigation into the tow lot was underway following the reporters' investigation, which "uncovered a paper trail of missing money and questionable practices." A state senator was also interviewed and noted

that several employees reported to her mismanagement occurring at the tow lot and she urged the mayor's office in 2019 to launch an investigation.

Neither the article nor the newscast identified Woods by name. The source of the information reportedly came from a current tow lot employee working with the reporters to dissect more than a hundred pages of tow lot records. During the on-camera interview, Woods's appearance and voice were disguised. Based on the records provided, the reporter calculated the City was owed $77,860 for 155 cars improperly marked as "redeemed" when no money was paid to the City and no buyer properly identified. The news piece referenced the prior complaints of misconduct at the tow lot, including a police investigation in 2019 about cars disappearing from the tow lot without proper payment. Flake was interviewed and denied the claims, referring to an audit finding no wrongdoing. He stated the tow lot made changes to its operations after the police investigation in 2019. When the story aired, the reporter was still waiting for a copy of the audit Flake referenced.

On February 5, 2021, the day after the news story aired, Wilson fired Woods. The termination letter stated: "It is my determination that your employment with the City of St. Louis be terminated immediately." Other than telling Woods she would be paid for any unused vacation and compensatory leave, the letter provided no further details or explanation.

In April 2021, Woods commenced this action. She alleges the City and Wilson unlawfully retaliated against her for exercising her First Amendment rights and the City unlawfully interfered with her FMLA rights. In pretrial rulings, the district court dismissed Woods's First Amendment claim against the City and narrowed her First Amendment claim against Wilson to include only reports that co-workers were engaging in the unlawful sale or transfer of vehicles at the tow lot.

In March 2024, the case proceeded to trial. After Woods rested her case, Wilson and the City unsuccessfully moved for judgment as a matter of law. Wilson and the City renewed their motions at the close of evidence. This time, the district

court again denied Wilson's motion but granted the City's motion as to the FMLA claim. The jury returned a verdict in favor of Woods, awarding her $207,612 in compensatory damages and $50,000 in punitive damages. The jury expressly found Woods satisfied her burden of proving she reported the unlawful sale or transfer of vehicles at the tow lot to Wilson, to the comptroller's office, to the personnel department, and to the news media at KSDK. The jury further found that Wilson was aware Woods made these reports to each of the people or entities listed, and that her reporting was a motivating factor in Wilson's decision to terminate Woods. Lastly, the jury found that Wilson would not have terminated Woods if he had not considered Woods's reports about employee misconduct at the tow lot.

After the verdict, Wilson renewed his motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(b), arguing (1) the "uncontroverted video evidence" established Woods engaged in "serious misconduct in the workplace;" (2) he was entitled to qualified immunity because it was reasonable for him to terminate Woods for violating the workplace violence and gender-based harassment policies; and (3) the evidence was insufficient to submit a punitive damages claim to the jury. In the alternative, Wilson argued he was entitled to a new trial under Federal Rule of Civil Procedure 59 because the district court erred in admitting the entire recording of Woods's pre-termination review hearing, which, according to Wilson, contained irrelevant and hearsay statements that inflamed the jury and unfairly prejudiced him. In a 46-page order, the district court denied Wilson's motions and ordered Wilson to pay attorney's fees in the amount of $233,673.60 plus post-judgment interest and costs in the amount of $2,694.41.

Wilson appeals the district court's decision. In his brief, Wilson asserts the district court erred when it denied his Rule 50(b) motion because Woods failed to present evidence from which a reasonable jury could find she was fired due to protected speech. He also renews his request for a new trial based on purported evidentiary errors as well as his challenge to submission of the punitive damages claim. In a couple of letters filed pursuant to Federal Rule Appellate Procedure 28(j), Wilson raised the issue of qualified immunity.

## II.    DISCUSSION

### A.    *Qualified Immunity*

At the outset, we must discern which issues have been preserved for appeal. Wilson did not raise the defense of qualified immunity prior to trial. He unsuccessfully raised the defense during trial after Woods rested her case and at the close of evidence, and again post-trial in his renewed motion for judgment as a matter of law. In Wilson's opening brief to this Court, the phrase "qualified immunity" appears a total of four times. Twice in the argument section reciting a few sentences of boilerplate law along with a sentence stating, "Unless it was clear that Plaintiff both engaged in protected speech and that terminating her would constitute retaliation for that speech, Wilson is entitled to qualified immunity." The only other time the phrase appears in Wilson's opening brief is in a conclusory sentence, stating: "There is no evidence from which a reasonable jury could conclude that Plaintiff was terminated because of her complaints, particularly given the leeway afforded Wilson by the doctrine of qualified immunity."

Wilson did not file a reply brief. In examining whether Wilson preserved the issue of qualified immunity for appellate review, we note he neither applied the law recited in his brief about qualified immunity to the facts in this case, nor did he argue application of the doctrine in any meaningful way. Wilson's motion to file an untimely reply brief—submitted two weeks before the scheduled argument—was denied by this Court.

It is well established that "[p]oints not meaningfully argued in an opening brief are waived." Ahlberg v. Chrysler Corp., 481 F.3d 630, 634 (8th Cir. 2007). After the argument, Wilson filed a letter under Federal Rule Appellate Procedure 28(j), citing his Rule 50 motions filed in the district court that raised the issue of qualified immunity. However, attempts to incorporate arguments by reference do not remedy a party's failure to raise an issue on appeal. Brown v. Mortg. Elec. Registration Sys., Inc., 738 F.3d 926, 934 n.8 (8th Cir. 2013). Further, Rule 28(j)

-7-

authorizes a party to advise the Court of authorities that come to its attention after filing its brief or after argument. It is not a procedure for supplementing the record or raising new issues. See Meeks v. United States, 742 F.3d 841, 844 (8th Cir. 2014). Because Wilson did not meaningfully brief the doctrine of qualified immunity, he failed to preserve the issue for review, and we decline to consider it.

### B.     *Sufficiency of Evidence*

Wilson contends the district court erred in denying his motions for judgment as a matter of law because the evidence does not support the jury's finding that Woods's termination was based on protected speech. Wilson points to the purported "three separate incidents of misconduct" identified in his pre-termination letter, and argues it was Woods's own conduct that caused her termination.

We review the denial of a Rule 50 motion *de novo*, viewing the evidence in the light most favorable to the verdict, drawing all reasonable inferences in favor of the verdict, and resolving any conflicts in favor of the verdict. Beran v. VSL North Platte Court LLC, 144 F.4th 1007, 1012 (8th Cir. 2025). "We 'will reverse only if there is a complete absence of probative facts to support the verdict.'" Krekelberg v. City of Minneapolis, 991 F.3d 949, 953 (8th Cir. 2021) (quoting Am. Bank of St. Paul v. T.D. Bank, N.A., 713 F.3d 455, 461-62 (8th Cir. 2013)).

The district court meticulously recounted the evidence supporting the verdict, noting Woods presented ample evidence to discredit the reasons for termination identified by Wilson in his pre-termination letter. Woods testified that she never told a customer her bag was stolen by a tow lot employee. Wilson did not refute this evidence. As to Wilson's belief that Woods secretly recorded a supervisor's meeting, it is within the jurors' prerogative to credit Woods's testimony that she was recording her activities, not a supervisor's meeting. The recording depicted Woods placing her phone in a common area where she was plainly visible. Wilson did not refute Woods's testimony that "[e]veryone in the office recorded conversations."

As to the final reason for termination identified by Wilson—the verbal altercation, which Wilson places the most emphasis on—a reasonable jury could find this was a pretextual reason to terminate Woods for her protected activities. A reasonable jury could conclude Stayton received more favorable treatment for seemingly equal, if perhaps not greater, culpability in the altercation, despite Stayton having a documented prior disciplinary record, which included similar conduct of using threatening language and near physical violence against a co-worker.

In addition to presenting evidence discrediting Wilson's stated reasons for termination, Woods highlighted that her pre-termination hearing was the only one Wilson opted to handle during his tenure as director. The jury could have weighed the fact that Wilson assigned Flake the task of considering discipline for Stayton along with the evidence showing Wilson, Flake, and Stayton were part of an informal "buddy system" to protect those participating in the unlawful sales or transfers of tow lot vehicles.

While Wilson testified that nothing Woods presented at the pre-termination hearing changed his mind about terminating Woods, days passed with no action by Wilson. One day after the news released its story about ongoing misconduct at the tow lot, which included information provided by Woods, Wilson fired Woods. Temporal proximity, combined with other evidence showing animus towards Woods, could cause a reasonable jury to assess credibility and resolve factual disputes of pretext in favor of Woods. See Brown v. Diversified Distrib. Sys., LLC, 801 F.3d 901, 909 (8th Cir. 2015) (explaining that when viewed in context of the overall record, temporal proximity may support an inference of retaliation and may also affect the reasonableness of inferences drawn from other evidence). The evidentiary record contains probative facts supporting the jury's verdict. After weighing the evidence, the jury found Woods's evidence more persuasive. Because there is ample evidence to support a reasonable inference that Woods's protected speech was a motivating factor in Wilson's decision to terminate her and we are not free to second guess the jury's verdict or reweigh the evidence on appeal, Wilson's

challenge to the sufficiency of the evidence fails.  See Gruttemeyer v. Transit Authority, 31 F.4th 638, 648 (8th Cir. 2022).

C.    *Alleged Evidentiary Errors*

Next, Wilson contends the district court made "prejudicially errant evidentiary rulings" warranting a new trial.  Wilson asserts the district court "errantly admitted two highly prejudicial news exhibits: a written news article and a video which discussed the same topic: misconduct at City Tow."  And the district court "compounded the prejudice" by admitting the recording of the pre-termination hearing as well as materials referenced by Woods's counsel during the hearing.  He also challenges the admission of testimony from two former tow lot employees, James Mundy and Jerome Cooley, on the grounds that they were not similarly situated to Woods and their testimony was more prejudicial than probative.

We review for abuse of discretion the district court's admission of evidence.  Reinard v. Crown Equip. Corp., 983 F.3d 1064, 1066 (8th Cir. 2020).  Likewise, we review the district court's denial of a new trial motion under the deferential abuse of discretion standard.  Reach Companies, LLC v. Newsert, LLC, 94 F.4th 712, 716 (8th Cir. 2024).  When a new trial motion is premised on evidentiary errors, we will reverse only upon a finding of "a clear and prejudicial abuse of discretion."  Nicholson v. Biomet, Inc., 46 F.4th 747, 762 (8th Cir. 2022).  A clear and prejudicial abuse of discretion requires a showing that "the errors misled the jury or had a probable effect on a jury's verdict."  Id.

1.    News Article and Story

Wilson challenges admission of a news article and newscast discussing employee misconduct at the tow lot because it referred to Woods as a "whistleblower" and featured her analyzing documents with reporters.  Wilson sought to exclude the media coverage at trial, asserting it was hearsay, irrelevant, and prejudicial.  He also contended it was cumulative to admit both the article and

the on-air story. The district court overruled Wilson's objections and he did not seek review of these rulings in his motion for a new trial before the district court.

On appeal, Wilson claims the evidence was "wholly irrelevant" and unfairly prejudicial because Woods's involvement with the media could not have been a factor in her termination since Wilson did not know about it when he made his decision to terminate her employment. Wilson's argument misstates the evidence. Wilson's pre-termination letter advised Woods that the City was "considering [her] dismissal" and the purpose of the hearing was to afford her an opportunity to respond and present her own evidence. Woods responded to the City's stated reasons for termination by asserting, in part, unlawful retaliation for reporting illegal activities at the tow lot. Wilson learned at the hearing that Woods had been in contact with the media about misconduct at the tow lot.

After the hearing concluded, several days passed with Wilson taking no action on Woods's employment status. Wilson terminated Woods the day after the news article and story were released. The district court found that disclosing illegal activities occurring at the City tow lot to the media was speech protected by the First Amendment. After the media coverage, the public became privy to not only detrimental information about operations at the City tow lot that Woods, and others, had provided, but that the alleged unlawful activities caused the St. Louis Circuit Attorney's Office to open an investigation. Given the sequence of events and the fact that Wilson terminated Woods's employment after the news broke, the news article and story were not "wholly irrelevant," as it was for the jury to decide whether Woods's involvement with the media was a motivating factor in Wilson's decision to terminate her. An examination of the information Woods provided to the media was relevant to a material issue.

Further, the federal rules of evidence do not offer protection against evidence that is prejudicial in the sense that it is detrimental to a party's case. Krekelberg, 991 F.3d at 956. Wilson has not convinced us that the evidence was so inflammatory on its face that it diverted the jury's attention from the material issues the jury was

-11-

asked to decide. See Equal Emp. Opportunity Comm'n, 142 F.4th at 1133 (defining the phrase "unfairly prejudicial"). The district court is in a better position than we to balance the probative value of evidence against its prejudicial effect, id. at 1134, and, here, we can discern no abuse of discretion.

Wilson has failed to show a clear and prejudicial abuse of discretion in admitting news coverage that was probative and relevant to Woods's First Amendment retaliation claim. Equal Emp. Opportunity Comm'n v. Drivers Mgmt., LLC, 142 F.4th 1122, 1133 (8th Cir. 2025) (defining relevant evidence as "that which tends to make a fact of consequence more or less probable than it would be without the evidence").

### 2.      Recording of Pre-Termination Hearing

Wilson also objected at trial to admission of the pre-termination review hearing recording, asserting: "It's just 45 minutes of completely irrelevant information that would be highly prejudicial to the City. It has no probative value." In response, Woods argued the recording was probative of Wilson's knowledge, as Wilson conducted the hearing and made the final decision to terminate Woods. The district court agreed with Woods and allowed the recording to be played for the jury.

Wilson's claim that the entire recording should have been excluded because he testified that nothing at the hearing changed his mind about firing Woods is unavailing. As has been noted, Wilson's knowledge of Woods's protected speech in the form of complaints of wrongdoing to her supervisors, other City officials, and the media was relevant to Woods's First Amendment retaliation claim. What Wilson knew at the time he made the decision to terminate Woods was relevant to Woods's retaliation claim. See Fed. R. Evid. 401(a).

Wilson's claim also ignores evidence from which a jury could draw reasonable inferences and decide to discredit his testimony. While Wilson testified that he had made up his mind before the pre-termination hearing and nothing

-12-

presented at the hearing changed his mind, days passed before Wilson acted on Woods's employment status. Wilson terminated Woods's employment the day after Woods's protected speech was disclosed to the public. Assessing witness credibility and determining whether Wilson's proffered reasons for termination were pretextual was a disputed issue for the jury to decide.

Despite having probative value, Wilson also seeks exclusion of the entire recording because it contains statements that go beyond Woods's complaints about misconduct at the tow lot as well as statements that are cumulative. Wilson never asked for any portion of the recording to be redacted, resulting in the district court being confronted with an all-or-nothing approach. Wilson also never asked for a limiting instruction to be given to the jury. Typically, when a party does not request specific relief, such as redactions or a limiting instruction at trial, we review the claim for plain error. See United States v. Larry Reed & Son's Partnership, 280 F.3d 1212, 1215 (8th Cir. 2002) ("When neither party requests a limiting instruction at trial, however, we review the trial court's failure to issue such an instruction for plain error."); Harris v. King, No. 96-2452, 1997 WL 792472, at *1 (8th Cir. 1997) (unpublished) (explaining that when no limiting instruction was requested to explain the purpose for which the evidence was intended, a district court's failure to give an instruction is reviewed for plain error). We will reverse an evidentiary ruling under plain error review only when "the error was plain, affected the party's substantial rights, and seriously affects the fairness, integrity, or public reputation of judicial proceedings." Chism v. CNH Am. LLC, 638 F.3d 637, 640 (8th Cir. 2011)

Wilson has not satisfied his burden of showing plain error. Having not asked for any redactions, Wilson waited until the recording was played in its entirety to the jury and then asked for a sidebar and moved for a mistrial due to "the amount of hearsay and prejudicial information that just came in from that recording." In denying Wilson's motion, the district court explained that this was all information presented to Wilson in response to the notice that the City planned to terminate Woods's employment. The court advised Wilson's counsel that Wilson can explain if he thinks it's all false, but it was not now going to hold a "mini-trial" on this

dispute. The court made an additional comment about the litigation strategy: "And I'm frankly learning a lot of stuff I didn't learn even in the summary judgment motions because some things I had no idea that [Wilson] claims not to know anything even though he signed both [the pre-termination and termination] letters." Wilson forfeited his evidentiary objection when he let the recording play in full and then claimed such substantial prejudice that only a mistrial could remedy the wrong. Because the video contained probative evidence on a material factual dispute and Wilson never asked for a limiting instruction or redactions, Wilson has failed to show either plain error or a clear abuse of the district court's discretion.

### 3. Pre-Termination Review Hearing Materials

Wilson next challenges admission of three exhibits, which were submitted at the pre-termination review hearing—Exhibit 4 (a letter sent by Woods's counsel to Wilson alleging whistleblower retaliation), Exhibit 7 (an email dated November 24, 2020, regarding employees taking items from vehicles on the tow lot), and Exhibit 9 (a written reprimand for Stayton). Wilson contends these materials were irrelevant, replete with hearsay, highly prejudicial, and confusing or misleading.

Notably, the district court did exclude one of the exhibits Wilson challenges in this appeal. According to the Clerk's Trial Exhibit List and the trial transcript, Exhibit 83 contained the pre-termination review hearing exhibits, which were divided into subparts. Only subparts 5 through 10 were admitted. Subpart 4 was not admitted and not seen by the jury. Contrary to Wilson's claim, Woods was not permitted to introduce Exhibit 4 and "give the jury a letter from her attorney repeating the unsupported allegations."

Exhibit 7 is an email sent by a law enforcement officer to Young dated November 24, 2020, which stated, in part: "The dispatcher also advised us that the employees take things from the vehicles on the lot all the time." Wilson asserts the email was irrelevant because it did not relate to Wilson's termination decision or to Woods's conduct. Wilson's assertions are contradicted by the record. In his pre-

-14-

termination review letter, Wilson accused Woods of providing "misinformation" on November 24, 2020, to a customer and this "misinformation" and "false allegation" resulted in a police report and investigation. Woods denied engaging in the conduct alleged by Wilson. At trial, Wilson testified that he terminated Woods "for the allegations that were in her pre-termination review notice." Wilson's argument that this email contained irrelevant information and did not relate to his decision to terminate Woods is plainly inconsistent with the evidence presented at trial. The district court did not abuse its discretion when it admitted the email outlining conduct that purportedly formed a reason for Woods's termination.

Lastly, as described by Wilson, Exhibit 9 is an "undated, unsigned 'written reprimand' (that does not appear on City letterhead) purportedly for Shonnell Stayton regarding her attitude." At trial, Wilson objected to admission of the document, arguing: "This is not a Department of Personnel document. We don't know who typed it, where it came from." The district court overruled Wilson's objection, stating: "But we know it was before the decision-maker when he was conducting the pre-termination hearing." While questioning Wilson on redirect, Wilson's counsel suggested that the letter was "consistent with Ms. Woods' complaints" and appears "that she might have written [it]." Woods responded to these suggestions by recalling James Mundy to the stand. Mundy explained to the jury that when he was the Commissioner overseeing the tow lot, he issued this reprimand to Stayton due to her attitude. Mundy told the jury that Stayton was "very unprofessional," he observed Stayton "constantly yelling at people," and Stayton even yelled at him. Mundy testified that he typed the document marked as Exhibit 9, he put the letter in Stayton's employee file, he gave Stayton a copy of the letter, and he emailed the letter to Flake and Wilson.

Unrefuted trial testimony established Exhibit 9—while not on City letterhead or signed by the author—was a letter of reprimand issued to Stayton by Mundy when he was the Commissioner of Streets. The letter was properly authenticated and was relevant to show Stayton, a co-worker of Woods who was part of the "buddy system," was treated more favorably following the New Year's Eve verbal

altercation than Woods, despite Stayton's disciplinary history and workplace misconduct. The district court characterized Wilson's decision to suggest Woods fabricated the letter of reprimand as an "attempted 'gotcha' moment gone awry." Wilson cannot now complain about the prejudicial impact of the letter that was created by his own questioning.

### 4.        Testimony of Former Tow Lot Employees

In his final evidentiary challenge, Wilson takes issue with the admission of testimony from two former tow lot employees, Mundy and Cooley. Wilson claims these witnesses were not similarly situated to qualify as "me too" witnesses. He also claims Stayton was not an adequate comparator. Both of his arguments are unavailing.

Woods attempted to show the City engaged in a pattern of retaliation when an employee reported the same illegal activities at the tow lot as she did. Mundy testified that after he pointed out improprieties in how the tow lot was being run—including missing or unaccounted for vehicles—Wilson terminated him. Similarly, Cooley testified about witnessing co-workers falsifying documents and engaging in the illegal sale and transfer of vehicles. Cooley joined Woods when she reported the illegal activities to the comptroller's office. His testimony corroborated Woods's reports of illegal activities to City officials. After reporting the illegal activities, Cooley was transferred out of the tow lot and to the City's refuse division.

Wilson offered explanations to the jury as to why Mundy was terminated and Cooley was transferred. Wilson told the jury that the City decided not to extend Mundy's employment beyond the probationary period due to poor job performance. As to Cooley, Wilson testified that the transfer was because Cooley could not get along with Young, who was his supervisor. Wilson has presented no persuasive basis for excluding the evidence. The jury was free to accept or reject Wilson's explanations. To justify exclusion of the evidence and award a new trial, Wilson asks us to credit and accept his evidence and reject Woods's evidence and any

inferences that may be drawn in her favor. Wilson's arguments are based on an incorrect standard. He has not met his burden of showing the district court abused its discretion when it allowed Mundy's and Cooley's testimony.

Wilson also contends evidence as to how Stayton was treated after the verbal altercation should have been excluded because Stayton was not "similarly situated" or a permissible comparator. Woods did not bring an employment discrimination claim based on disparate treatment, which requires courts to examine closely comparators. Rather, Woods asserted a First Amendment retaliation claim. How Stayton was treated in response to the verbal altercation, which was purportedly the impetus for Woods's termination, is relevant to her claim that Wilson's proffered reason for termination was pretextual.

Once again, to support his claim for exclusion, Wilson asks us to view the evidence in his favor and conclude the conduct by the two employees during the verbal altercation was "materially different." It is the jury's function to consider competing evidence and competing views of the evidence. Wilson played the video of the altercation several times for the jury. He argued to the jury that the evidence demonstrated that Woods was terminated because of her own misconduct. The jury sided with Woods. The district court did not abuse its discretion in admitting evidence that goes to the material issue of whether Wilson's stated reasons for terminating Woods were pretextual.

In conclusion, Wilson has not shown any of the district court's evidentiary rulings were erroneous, let alone a clear and prejudicial abuse of discretion. This Court is not permitted to change a jury's verdict, exclude evidence, or grant a new trial simply because the losing party has a different view of the evidence. We can find no abuse of the district court's discretion when it denied Wilson's motion for a new trial.

*D.      Punitive Damages*

Wilson also asks us to strike the punitive damages award.  He argues there was no evidence that Wilson addressed Woods's misconduct other than appropriately so his decision cannot have been malicious or reckless.  When a defendant asserts insufficient evidence was presented to submit the issue of punitive damages to the jury, we review *de novo* whether there was sufficient evidence and view the evidence in the light most favorable to the verdict.  Mayfield v. Mo. House of Representatives, 122 F.4th 1046, 1057 (8th Cir. 2024) (citation omitted).

A jury is permitted to consider awarding punitive damages when there is sufficient evidence to show a defendant's conduct was motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.  Naucke v. City of Park Hills, 284 F.3d 923, 929 (8th Cir. 2002).  The focus when considering punitive damages is on whether the offensive conduct calls for deterrence and punishment beyond a compensatory award.  Id.  This Court has upheld punitive damages awards for retaliatory action taken in response to speech protected by the First Amendment.  See, e.g., id. (affirming $100,000 and $30,000 punitive damages awards); Mayfield, 122 F.4th at 1058 (affirming jury's award of $15,000 in punitive damages).

The record shows Woods requested to meet with Wilson about her concerns regarding unlawful activities at the tow lot.  While Wilson refused to meet with Woods, Wilson was communicating with fellow "buddy system" members about Woods's allegations.  Without ever meeting with Woods, Wilson signed a pre-termination review hearing letter setting forth three incidents of alleged misconduct.  As to two of the incidents, Wilson apparently did not verify whether Woods actually spoke to a customer about missing property, nor considered whether employees were routinely recording office conversations.

As to the verbal altercation, Wilson played a recording of the incident multiple times for the jury.  A reasonable jury could find the co-workers engaged in similar

-18-

conduct. Woods's co-worker, however, had a documented disciplinary history of engaging in this type of unprofessional behavior. Yet only Woods was considered for termination. And Wilson elected to personally handle Woods's pre-termination hearing—the only one he conducted during his tenure as director, while asking Flake, part of the "buddy system" to handle discipline for Woods's co-worker.

While Wilson testified that nothing presented at the pre-termination hearing changed his mind, days passed without Wilson acting on Woods's employment status. It was not until the day after the local news publicized details about the employees' unlawful activities (many of which Woods provided) that Wilson fired Woods. Viewing these facts in the light most favorable to the verdict and drawing all reasonable inferences in favor of Woods, there was sufficient evidence to create a jury question as to whether Wilson acted with, at a minimum, "reckless indifference" to the fact that his conduct could violate federal law.

The jury was instructed that it could find Wilson acted with reckless indifference if he knew Woods's termination "was in violation of the law prohibiting retaliation or acted with reckless disregard of that law." This Court has further explained that an employer acts with "reckless indifference" for purposes of considering a punitive damages award when "it responded to serious employee allegations in a half-hearted manner, conducted an inadequate investigation, and threatened an employee with possible termination." Beran, 144 F.4th at 1014 (cleaned up).

Woods tried but was unsuccessful in convincing Wilson to meet with her to discuss the unlawful activities employees were engaging in at the tow lot. When Woods felt the response from City officials was inadequate, she went to the media and engaged in protected speech. Wilson terminated Woods's employment after learning the details and information that she provided to the media about the unlawful activities occurring at the tow lot. Viewed in favor of the verdict, there is sufficient evidence showing reckless indifference as to the investigation (or lack thereof) that Wilson conducted regarding unlawful employee conduct at the tow lot

as well as his investigation (or lack thereof) into Woods's purported instances of misconduct that he identified as the reasons for his decision to terminate Woods. This evidence could have led a reasonable jury to conclude Wilson was motivated by evil motive or intent when he terminated Woods's employment. The evidence also could have led a reasonable jury to conclude that Wilson acted with reckless indifference when he terminated Woods's employment in reckless disregard of the law prohibiting retaliation. Wilson has not presented a permissible basis for setting aside the jury's punitive damages award.

## III.  CONCLUSION

For the foregoing reasons, we affirm the district court's judgment.

_____